**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| ANGELA MORGAN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 6:17-cv-01972-CEM-GJK |
| v. | ) ) | |
| ORLANDO HEALTH, INC., G&G ORGANIZATION, LTD. d/b/a PFS GROUP, and RMB, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MOTION FOR CLASS CERTIFICATION</u>

Pursuant to Fed. R. Civ. P. 23, Plaintiff Angela Morgan moves the Court to order that this action may proceed on behalf of the classes defined below against Defendants Orlando Heath, Inc. ("OHI"), RMB, Inc. ("RMB"), and G&G Organization, Ltd. d/b/a PFS Group ("PFS") pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

## I.     INTRODUCTION

This putative class action is about the Defendants' use of automatic telephone dialing systems ("ATDS") and artificial or prerecorded voices to place debt collection calls for OHI to unrelated third parties without their consent.  The classes proposed for certification are comprised of persons, like Plaintiff, who told Defendants they had the wrong number and to stop calling.  Defendants know they routinely call wrong numbers, as they have multiple specific codes for documenting wrong number calls in their systems of record.

Based on the call records produced by Defendants, PFS made at least 16,051 "wrong number"-dispositioned calls to 16,051 telephone numbers on behalf of OHI.  *See Biggerstaff*

1

*Dep.*, 102:5-11, 103:3-10, 104:24-105:13, attached as **Exhibit 1**; *Biggerstaff Dep. Ex. 2*, row 12, attached as **Exhibit 2**. After removing duplicates, there were 9,718 unique cellular numbers called.

For its part, RMB made over 120,000 calls to at least 6,500 unique cellphone numbers on behalf of OHI that were coded as wrong numbers. *See Biggerstaff Report* ¶ 19, attached as **Exhibit 3**. Many of the wrong numbers RMB called already had a wrong number notation in OHI's records before OHI ever sent the accounts and numbers to RMB for collection. For example, PFS's April 5, 2017 account notes state Plaintiff was not the debtor. *See PFS Dep. Ex. 4* at OHI000026 (ln. 33-34), attached as **Exhibit 4**. This record was returned to OHI. *See OHI Account History* at 5 (4/5/17 entry, "OPH#" adjacent to number), attached as **Exhibit 5**. Yet, OHI forwarded that number to RMB for RMB to call, which it did on June 20, 2017.

Plaintiff seeks class-wide adjudication on behalf of people possessing the same TCPA claim for statutory damages and injunctive relief as Plaintiff. As detailed below, each requirement for class certification is satisfied.

## II.    THE TELEPHONE CONSUMER PROTECTION ACT

"Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the Federal Communications Commission. If robocalls were a disease, they would be an epidemic." Rage Against Robocalls, Consumer Reports (July 28, 2015). "Robocalls" are the #1 consumer complaint in America today and the defendants' conduct in this case is a good reason why. "Senator Hollings, the TCPA's sponsor, described these calls as '**the scourge of modern civilization**, they wake us up in the morning; they interrupt our dinner at night; they force the sick and

elderly out of bed; they hound us until we want to rip the telephone out of the wall.'" 137 Cong. Rec. 30, 821 (1991) (emphasis added).

The "[v]oluminous consumer complaints about abuses of telephone technology . . . prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012) (TCPA claim for debt collection calls). Congress found "automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call," and decided that "banning" such calls made without consent was "the only effective means of protecting consumers from this nuisance and privacy invasion." TCPA, Pub. L. No. 102-243, 105 Stat. 2394, 2394-95 (codified at 47 U.S.C. § 227).

"An automated call to a landline phone can be an annoyance; an automated call to a cell phone adds expense to annoyance" because, unlike a human caller who would realize, for example, if he or she had the wrong number, "predictive dialers lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-39 (7th Cir. 2012). Accordingly, the TCPA makes it unlawful to make any call using an ATDS or an artificial or prerecorded voice to any cellular telephone number unless the call is made "for emergency purposes" or with the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA creates a private right of action for persons affected by violations and provides for statutory damages in the amount of $500 per violation. 47 U.S.C. §227(b)(3).

## III.    STATEMENT OF FACTS

OHI's debt collectors are no strangers to the TCPA. The year before this lawsuit was filed, PFS was sued in *Verchow v. PFS Group, Inc.*, 4:16-cv-01796 (S.D. Tex.). Similarly,

3

RMB has been sued in three prior cases for violating the TCPA: *Gershbaum v. RMB, Inc.*, 3:14-cv-02320-MAS-TJB (D.N.J.); *Scruggs, et al. v. RMB, Inc.*, 3:13-cv-00718-PLR-CCS (E.D. Tenn.); *Adams v. John Does 1-100 inclusive*, 2:12-cv-00822-JAT (D. Az.).

Undeterred[1], they continued to blast out robocalls to collect purported debts even though they knew the robocalls were regularly being made to wrong numbers flagged with specific wrong number codes within their own systems.

PFS's code is "Oph#".  *See PFS Rule 30(b)(6) Dep.*, 130:7-12, 130:18-24 (testifying notes on Exhibit 4 of the PFS Dep. mean agent selected wrong number code, resulting in Oph# code adjacent to applicable phone number), attached as **Exhibit 6**; Ex. 4, ln. 33-34 (PFS Dep. Exhibit 4).  RMB's wrong number code is a "B" phone flag.  *RMB Rule 30(b)(6) Dep.*, 7:2-5, 88:16-22, 92:13-16, 92:24-93:6, 114:15-115:4, attached as **Exhibit 7**.

In Plaintiff's case, PFS called numerous times and left six prerecorded voice messages seeking to recover a debt from someone else.  *See* Ex. 6, 125:1-3, 125:25-126:1, 128:11-129:7 ("PRE-RECORDED MESSAGE LEFT" or "AUTO MESSAGE LEFT" followed by "*Dialer" mean a prerecorded voice message was used); Ex. 5 at 5 (OHI Account History).

On April 5, 2017, Plaintiff was finally able to speak with a real person and instructed PFS that it was calling the wrong number.  *See Angela Morgan Dep.*, 58:17-20, attached as **Exhibit 8**; Ex. 4, ln. 33-34.    PFS recorded the number as a wrong number, *see* Ex. 4, ln. 34, and sent that note back to OHI, *see* Ex. 5 at 5 (4/5/17 entry); *see also* Ex. 6, 119:24-120:2, 120:14-15, 126:12-15.

OHI nevertheless then sent that same account and Plaintiff's number to RMB for

---

[1] The fact that most of the Defendants have been sued under the TCPA illustrates the need for class wide relief.

collection.  *See OHI Rule 30(b)(6) Dep.*, 19:11-24, 21:8-22:3, 78:12-15, attached as **Exhibit 9**; Ex. 7, 85:13-20, 87:24-88:2.  RMB's call data shows RMB made two additional calls to Plaintiff—one predictive dialer call and one prerecorded voice call.  *See* Ex. 7, 31:19-32:5, 109:25-110:8, 112:15-19; *RMB Call Data Excerpt*, columns I-J, attached as **Exhibit 10**.[2]

Because OHI maintains records of when its vendors call wrong numbers, it was ordered to produce those records for the PFS and RMB calls.  *See* ECF No. 142.  Plaintiff's expert testified PFS made thousands of "wrong number"-dispositioned calls to 16,051 telephone numbers.  *See* Ex. 1, 102:5-11, 103:3-10, 104:24-105:13; Ex. 2, row 12; *see also* Ex. 3 ¶¶ 25-33, 43-59 (Plaintiff's expert explaining his "iterative" methodology); Ex. 1, 25:20-26:19, 32:17-33:3, 74:6-76:7, 100:19-101:11, 102:12-103:10, 107:3-17, 109:18-110:6 (explaining how he applied same "iterative process" to records of PFS calls).  After scrubbing those numbers to remove landlines and duplicates as described in his report and testimony,[3] Plaintiff's expert identified 9,718 unique cellular numbers to which PFS made a wrong-number-dispositioned call.

As to RMB's records, they revealed over 120,000 calls to at least 6,500 unique cellular telephone numbers that RMB coded as wrong numbers.  Ex. 3 ¶¶ 17-19.  At least 179 of the

---

[2] This exhibit was created by the undersigned for the Court's convenience, and was previously filed under seal as Exhibit 6 to ECF No. S-109.  Rows 2 and 3 are, respectively, the abbreviated field headings from the call data produced by RMB as Bates number RMB000230, and the one line of data in RMB000230 relating to the OHI patient account Defendants repeatedly called Plaintiff's cellphone number about.  Row 1 is the unabbreviated headings for that data which RMB produced as Bates number RMB000229.

[3] Plaintiff's expert used Interactive Marketing Solutions, Inc.'s database to determine cellular telephones at the time of the call.  *See* Ex. 3 ¶¶ 43-51.  Indeed, the FCC has relied on this database in its enforcement actions of the TCPA's requirements.  *See In Re Dialing Services, LLC*, 29 FCC Rcd 5537, 5540, n. 16 (May 7, 2014) (citing to Interactive Marketing Solutions, Inc.'s database, available at http://www.ims-dm.com/index.shtml, as the "industry-standard, commercially available database of known assigned and ported wireless numbers to determine whether the Company made robocalls to wireless telephones").

wrong numbers RMB called had a wrong number notation in OHI's records before OHI ever sent the accounts and numbers to RMB for collection.

Plaintiff has issued subpoenas to the cellular carriers seeking the subscriber and user information for the 9,718 unique cellular numbers with PFS wrong-number-dispositioned calls, as well as for the 6,500-plus cellphone numbers RMB coded as wrong numbers, in order to compare against Defendants' records as set forth below. *See* Notice of Subpoenas, attached as **Exhibit 11**.[4]

Plaintiff therefore asks the Court to certify the following classes of similarly-situated persons:

**OHI CLASS**
(1) All persons in the United States (2) to whose cellular telephone number (3) Orlando Health or anyone acting on its behalf placed a non-emergency telephone call (4) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present and (6) where any Defendant's records note said telephone number was a wrong number.

**RMB Class**
(1) All persons in the United States (2) to whose cellular telephone number (3) RMB placed a non-emergency telephone call relating to an Orlando Health debt (4) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present and (6) where any Defendant's records note said telephone number was a wrong number.

**PFS Class**
(1) All persons in the United States (2) to whose cellular telephone number (3) PFS placed a non-emergency telephone call relating to an Orlando Health debt (4) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present and (6) where any Defendant's records note said telephone number was a wrong number.

---

[4] Ex. 11 only includes one carrier subpoena, as the subpoenas were all identical except for recipient information.

## IV.     CLASS CERTIFICATION IS COMMON IN TCPA CASES

"Class certification is normal in litigation under [the TCPA], because the main questions … are common to all recipients." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quoting *Ira Holtzman, C.P.A. & Assoc., Ltd. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013)); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (affirming class certification).

Class certification continues to be the norm for "wrong number" TCPA cases.  In *Reyes v. BCA Fin. Servs.*, 2018 U.S. Dist. LEXIS 106449 (S.D. Fla. June 26, 2018), the court certified a wrong number TCPA class in the face of defendant's objection that the "wrong number" notations in its records did not necessarily mean what they said.  Relying on methods proposed by plaintiff's expert that included identifying wrong number records in defendant's account and call data, the court rejected defendant's position, explaining that, although the "notations may not incontrovertibly establish that BCA dialed a wrong number, and thus would not conclusively establish who is a class member, that fact does not defeat class certification because Reyes is not proposing to rely solely on BCA's records to identify class members. Rather, those notations would represent a *starting point* from which Reyes can further define the class through the methods described by her expert, including the use of self-identifying affidavits and subpoenas." *Id.* at *37-38 (emphasis in original).

A similar method was approved in *Keim v. ADF MidAtlantic, Ltd. Liab. Co.*, 328 F.R.D. 668 (S.D. Fla. 2018).  Relying on methods proposed by Robert Biggerstaff—who is also Plaintiff's expert in this case—the *Keim* court granted class certification and held that ascertainability was satisfied because plaintiff could obtain carrier records in order to compare

Defendants' call records with the carrier records to remove instances where the subscriber for a multi-user phone plan provided consent for the user of the number called.

Even more recently in *Knapper v. Cox Comm'cns, Inc.*, 2019 U.S. Dist. LEXIS 19210 (D. Az. Feb. 6, 2019), the court certified a wrong number class despite the defendant's arguments "that its records do not necessarily represent true wrong numbers" and "there are many reasons why 'wrong number' dispositions, as reflected in Defendant's records, are not accurate." *Id.* at *12. The court agreed that the notations alone were not dispositive, but nevertheless certified the class and held "those phone numbers can be analyzed through a reverse lookup service and that other methods can be used to sanitize the phone numbers, on a class-wide basis, to address the consent issue," *id.* at *13, including "subpoenaing wireless carriers to 'obtain additional name and address information for the cellular telephone numbers at issue'" and comparing those names to the names in defendant's records to identify the mismatches, *i.e.* the non-customers called without consent, *id.* at *14-15.

Likewise, in *Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016), the court certified a wrong number class and rejected the argument "that every record marked as a wrong number may not actually have been a wrong number," finding that "these matters can be efficiently addressed" and "that, at this point in the litigation, while it is not required prior to certification, the Plaintiff's proposed method of identifying potential class members is adequate for class certification." *Id.* at 503.

The foregoing cases are not outliers. *See Lavigne v. First Cmty. Bancshares, Inc.*, 2018 U.S. Dist. LEXIS 94055, at *18-19 (D.N.M. June 5, 2018) (certifying wrong number class despite defendants' argument "that a call could be coded 'Bad/Wrong Number' for many

reasons" because "a number of courts have rejected this theory in 'Wrong Number' cases, under similar factual circumstances, at the class certification stage"); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 301-02 (N.D. Cal. 2017) (certifying wrong number class, reasoning "several district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number'"); *Abdeljalil v. GE Capital Corp.*, 306 F.R.D. 303, 308, 311 (S.D. Cal. 2015) (certifying wrong number class based on defendant's records, holding ascertainability satisfied "because class members likely can be determined by objective criteria based on defendant's business records and the class members will likely be able to identify whether they received prerecorded calls from defendant," further holding predominance satisfied as class definition was limited to wrong numbers, which plaintiff correctly argued is "evidence suggesting defendant did not obtain express consent"); *see also Reid v. I.C. Sys.*, 2017 U.S. Dist. LEXIS 43770, *4-5 (D. Ariz. 2017) (certifying settlement class of persons "whose cellular telephone number was . . . coded as a wrong number" in defendant's records); *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1039 (S.D. Cal. 2015) (certifying settlement class defined in terms of persons called "without consent" and "persons whose cellular telephone numbers were marked with a 'wrong number' code in Defendants' database").

On the other hand, the cases that have denied certification of a "wrong number" TCPA class: (1) did not involve business records that already identify the wrong number calls; and/or (2) failed to acknowledge that the identity of the persons called can be readily obtained from records of the telephone company or third-party vendors. For example, the court *Tillman v.*

*Ally Fin. Inc.*, 2017 U.S. Dist. LEXIS 216694 (M.D. Fla. 2017) denied certification where Plaintiff did not have the call records showing wrong number calls.

## V.     RULE 23 IS SATISFIED

Class certification is appropriate when Rule 23(a) and one subsection of Rule 23(b) are satisfied.  Fed. R. Civ. P. 23; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004). Rule 23(a) requires: (i) the proposed class be so numerous that joinder of individual class members is impracticable; (ii) there be questions of law and fact common to the class; (iii) the proposed class representative's claims be typical of the class claims; and (iv) the named class representative and counsel will fairly and adequately represent the interests of the class.  *Id.*

In this case, Plaintiff seeks certification of the proposed classes under Rule 23(b)(3), which requires that: (i) questions of law or fact common to the proposed class members predominate over any questions affecting only individual members; and (ii) the class mechanism be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); *Klay*, 382 F.3d at 1251.

### A.     The Classes Are Sufficiently Numerous.

The first requirement of Rule 23(a) is met when "the class is so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1); *see also Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 313 (S.D. Fla. 2010) (finding Rule 23(a) requires "that joinder is impracticable, not impossible").  Generally, the numerosity requirement is satisfied when the class comprises 40 or more members.  *See, e.g.*, *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).  In this case, the RMB class contains at least 6,500 people, the PFS class contains 9,718 people, and the OHI class contains all of those people combined.  *See infra* at

12-13.  Because each class consists of thousands of unique cellular telephone numbers that are coded as wrong numbers, numerosity is satisfied.

  **B.**  **The Classes Are Ascertainable.**

  The implied "ascertainability" element for certification requires that the class be defined by objective criteria. *See In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 651 (S.D. Fla. 2012). While Defendant may argue that ascertainability requires Plaintiff to "propose an administratively feasible method by which class members can be identified," *Karhu v. Vital Pharms., Inc.*, 621 Fed. Appx. 945, 847 (11th Cir. 2015) (unpublished), there is no published decision by the Eleventh Circuit adopting the administrative feasibility test. Furthermore, many Circuits have flatly rejected it. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 672 (7th Cir. 2015) ("Nothing in Rule 23 mentions or implies it, and we are not persuaded by the policy concerns identified by other courts."); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) (following *Mullins*). In fact, the Third Circuit, which *Karhu* relied upon, has since clarified that ascertainability is not that demanding and class members can be identified in an administratively feasible way using a combination of methods, such as the defendant's records and affidavits from putative class members. *See City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 441 (3d Cir. 2017).

  Regardless of the test this Court adopts, nothing in Rule 23 requires Plaintiff to be able to identify the name and address of every class member. Instead, Rule 23 expressly contemplates that not all class members can be identified through reasonable effort. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1320-21 (11th Cir. 2012) ("Where certain class members'

names and addresses cannot be determined with reasonable efforts, notice by publication is generally considered adequate.") (citing Fed. R. Civ. P. 23(c)(2)(B)); *Krakauer v. Dish Network LLC*, 311 F.R.D. 384, 394 (M.D.N.C. 2015) ("[Plaintiff] is not required to prove that, without a doubt, every single person on the class list would be able to recover to satisfy the ascertainability requirement.").

In short, Plaintiff need not provide a foolproof method to "identify [by name and address] all who fall within the class definition." *Mullins*, 795 F.3d at 657-58. "Instead, whether Plaintiff's list of persons in the IDNC and NDNC class lists will persuade a fact finder on the merits 'is simply a common question of fact.'" *Cordoba*, 320 F.R.D. at 598 (quoting *Krakauer* 311 F.R.D. at 394 n.4).

### 1.      The Classes are Ascertainable Through Objective Criteria.

In this case, each element of the class definitions is comprised of objective criteria that has been satisfied using Defendants' records.

The PFS class is comprised of the (1) 9,718 unique cellular telephone numbers (2) to which PFS placed a non-emergency telephone call relating to an OHI debt (3) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (4) from November 16, 2013 through the present and (5) where any Defendant's records note said telephone number is a wrong number ("Oph#").

The RMB class is comprised of the (1) over 6,500 unique cellphone numbers (2) to which RMB placed a non-emergency telephone call relating to an OHI debt (3) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (4) from November 16, 2013 through the present and (5) where any Defendant's

records note said telephone number is a wrong number ("B" Flag).

The OHI class is comprised of both the PFS and RMB classes combined.

TCPA cases throughout the country have held that the ability to ascertain a list of telephone numbers that fall within the class definition satisfies ascertainability. *See Sandusky*, 821 F.3d at 997 (finding in TCPA case that "fax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable"); *Amer. Copper & Brass v. Lake City Indust. Prod.*, 2014 U.S. App. LEXIS 12921, *12 (6th Cir. 2014) ("the fax numbers are objective data satisfying the ascertainability requirement"); *Mohamed v. Am. Motor Co., Ltd. Liab. Co.*, 320 F.R.D. 301 (S.D. Fla. 2017) (adopting in part report and recommendation at *Mohamed v. Off Lease Only, Inc.*, 320 F.R.D. 301, 312 (S.D. Fla. 2017) to certify the TCPA class where the only records of who is in the class is the list of cellular telephone numbers sent text messages); *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015) (finding TCPA class ascertainable because the plaintiff set forth a list of fax numbers to which to offending communications were sent)[5].

In addition, courts have rejected arguments a class is not ascertainable because the wrong number notations may not be accurate. As one court in this Circuit recently explained in certifying a "wrong number" class:

> [T]he Court disagrees with BCA's position that the limitations in its records keeping (i.e., the different meanings of its coding and the lack of historical track

---

[5] *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014) (holding that "objective criteria determine who are class members" as "calling lists can be used to identify the individual class members"); *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 U.S. Dist. LEXIS 177222, at *9-11 (S.D. Fla. Dec. 23, 2014) (finding list of "unique fax numbers" sufficient to satisfy ascertainability); *Stemple v. QC Holdings, Inc.*, 2014 U.S. Dist. LEXIS 125313, at *19 (S.D. Cal. Sep. 5, 2014) (finding TCPA class ascertainable, reasoning "[t]here is no requirement that the identity of the class members . . . be known at the time of certification" and the proposed class definition is definite enough "to ascertain whether an individual is a member of the class").

> record in the coding) prove fatal to class certification. The problem with that position is that . . . BCA is "essentially arguing that the contours of the class should be defined by [its] own recordkeeping." But that "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct."

*Reyes*, 2018 U.S. Dist. LEXIS 106449, at *38-39 (internal citations omitted); *accord Lavigne*, 2018 U.S. Dist. LEXIS 94055, at *17-18 (certifying wrong number class and rejecting challenge to ascertainability, reasoning "[t]he fact that the class may inadvertently include some customers that consented is not fatal to the predominance inquiry, especially since they can be weeded out"); *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 598 (N.D. Ga. 2017) ("DIRECTV's argument that Plaintiff's call data may be over inclusive, and that the proposed class members are therefore not ascertainable, is similarly unpersuasive" because, "were the Court to take this argument seriously, it would create the same 'perverse incentive' discussed in *Krakauer*, in effect permitting companies to create an almost foolproof shield against class liability simply by keeping vague or insufficiently detailed records"); *Krakauer*, 311 F.R.D. at 393 (rejecting Dish's argument that class could not be ascertained because its call records were over inclusive, explaining that to deny class certification on that basis "it would create the perverse incentive for entities to keep poor records and to violate the TCPA's clear requirement that such a list be kept"); *see also United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1014 n.21 (C.D. Ill. 2014) (rejecting claim that Dish's list was inaccurate because, "if Dish now asserts that its internal do-not-call list is not properly maintained and updated, then . . . Dish is conceding that all of its outbound telemarketing calls violate TCPA and the FCC Rule"). To the extent that the Court is concerned the classes may be over inclusive, Plaintiff proposes additional administrative methods to remove any such issue.

**2.      Although Not Required, It Is Feasible to Identify Class Members via Telephone Carrier Subpoenas and Other Methods.**

As noted above, there is no published Eleventh Circuit opinion requiring Plaintiff to establish "an administratively feasible method by which class members can be identified." *See Karhu*, 621 Fed. Appx. at 847 (unpublished).  Instead, Circuits have rejected any heightened "ascertainability" requirement, including the Third Circuit, which *Karhu* relied upon.

As one court in this Circuit synthesizing the foregoing cases explained, "there is no categorical prohibition against the types of information that may be used to identify potential class members." *Reyes*, 2018 U.S. Dist. LEXIS 106449 at *31.  Instead, "plaintiff must show 'an administratively feasible method by which class members can be *identified*.'  Nothing more, nothing less." *Id.* at *30 (emphasis in original; citations omitted).

Here, Plaintiff will verify class membership by subpoenaing the cellular telephone companies for the names and addresses of the subscribers and users of the cellular telephone numbers at issue on the dates of the wrong number notations.  Plaintiff's expert explained this process in his report.  *See* Ex. 3 ¶¶ 52-58.[6]  Moreover, Plaintiff's counsel has successfully done this in other cases. *See Martin v. Global Tel\*Link Corp.*, 2017 U.S. Dist. LEXIS 53899, *8-9 (C.D. Cal. 2017) (identifying over one million users and subscribers by subpoenaing the telecom providers); *Consent Orders* (for AT&T, Sprint, T-Mobile and Verizon to produce subscriber and user records for calls from 2010 to 2013 to compare with defendants' records

---

[6] As explained in ¶ 54 of his report: "When asking for subscriber data for a list of phone numbers (including historical subscriber data), larger carriers such as AT&T have dedicated teams with automated systems that will produce the desired information automatically and efficiently. Because these large carriers have accordingly large market share (the top 7 carriers have over 90% of the market), data can be obtained for the vast majority of phone numbers efficiently."

15

to remove any class member who may have consented, as set forth in *Keim*, *supra* at 7), attached as **Exhibit 12**.  And the necessary subpoenas have already been issued to the carriers in this case.  *See* Ex. 11.

Once the carriers comply, the parties can then compare the subscriber and user contact information obtained to Defendants' records to confirm that it does not match the contact information of the patient, guarantor or anybody else Defendants contend was the intended recipient.  Any matching person or even address would simply not be a class member.  In addition, for numbers for which the carriers have no subscriber and user data, Plaintiff will obtain that information using a reverse-lookup. *See Mey v. Venture Data, LLC*, No. 14-cv-123, Doc. 247 at 26 (N.D. W. Va. June 6, 2017) (certifying a TCPA class, observing that "numerous reliable databases exist from which a class administrator can accurately identify names and addresses based on a list of telephone numbers.").[7]

If there is still a concern about the classes being overinclusive despite being restricted to calls that Defendants' business records identified as wrong numbers and despite excluding any person with a name or address match after the subpoenas or reverse-lookups, the Court

---

[7] *Stemple v. QC Holdings, Inc.*, 2016 U.S. Dist. LEXIS 55011, at *11 (S.D. Cal. Apr. 25, 2016) ("hav[ing] the Claims Administrator perform a reverse telephone number look-up to determine the address information for class members . . . 'is an objective approach that reinforces the ascertainability of the class'"); *Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 442 (E.D. Mich. 2015) (finding a TCPA class "sufficiently ascertainable" because "Plaintiff possesses a list of numbers to which the fax was sent, and it is certainly feasible to determine which individuals and businesses received the faxes at those numbers"); *Booth v. Appstack, Inc.*, 2015 U.S. Dist. LEXIS 40779, at *9 (W.D. Wash. Mar. 29, 2015) (certifying TCPA Class where "Plaintiffs intend to rely on additional records, such as telephone carrier records and reverse-lookup directories, to identify class members and establish elements of the claims"); *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 623-24 (S.D. Cal. 2015) (holding proposed class "meets the requirement for ascertainability" because "Plaintiffs propose to use reverse look-up technology to identify potential class members who received a call"); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 248 (N.D. Ill. 2014) (holding "the identities of the persons whose numbers are on plaintiffs' list of 930,000—indeed, the subscribers for those numbers at the time defendants called them—are sufficiently ascertainable" as plaintiffs can "obtain their contact information to provide notice from either a third-party database or from the telephone carriers themselves").

can always require class members to attest on a claim form that they are not the person

Defendants were trying to reach.  *See City Select Auto*, 867 F.3d at 441 (holding that

"[a]ffidavits, in combination with records or other reliable and administratively feasible means,

can meet the ascertainability standard").

 This method is materially-identical to the process *Reyes* held "would be consistent with

*Karhu*."  *See Reyes*, 2018 U.S. Dist. LEXIS 106449 at *38.  As the *Reyes* court explained:

> [T]he Court agrees with Reyes that she has presented an administratively
> feasible method of identifying class members. Although "B" flags or "WN"
> notations may not incontrovertibly establish that BCA dialed a wrong number,
> and thus would not conclusively establish who is a class member, that fact does
> not defeat class certification because Reyes is not proposing to rely solely on
> BCA's records to identify class members. Rather, those notations would
> represent a *starting point* from which Reyes can further define the class through
> the methods described by her expert, including the use of self-identifying
> affidavits and subpoenas.

*Id.* at *37-38 (emphasis in original); *accord Northrup v. Innovative Health Ins. Partners, LLC*,

2019 U.S. Dist. LEXIS 268, at *14 (M.D. Fla. Jan. 2, 2019) (certifying TCPA class, holding

"such [subscriber and user] information could be obtained from cell phone carrier

documentation, or from inquiries to subscribers").

 Likewise, Plaintiff's proposal is virtually identical to the method recently approved in

*Keim*, 328 F.R.D. 668.  Relying on methods proposed by Robert Biggerstaff, *Keim* granted

class certification and held ascertainability was satisfied:

> [T]his Court finds that unlike the plaintiff's plan in *Karhu*, Plaintiff's proposal
> to identify the individual class members is based upon useful evidence and is
> administratively feasible.
>
> . . . To identify the class members, Plaintiff proposes the following basic plan:
> (1) use the data provided by Defendants, which lists the cellular telephone
> numbers that received the text messages in question and the associated phone
> carriers; and (2) subpoena the phone carriers for their records as to the names

> and addresses of the subscribers (and users, if available) of those telephone
> numbers during the relevant time frame. To account for group plans where the
> user of the telephone number might be different than the subscriber and the
> carrier does not retain user identification information (and any missing
> subscriber data), Plaintiff's proposal (as supplemented in his reply brief) also
> includes the following additional steps: (3) in cases of group plans where the
> carriers do not retain records of the users of each line, send the notice to the
> subscriber's address to the attention of the user of the cellular phone number;
> and (4) use reverse lookups for any subscriber information not retained by the
> carriers. Plaintiff emphasizes, and even Defendants admit, that the subscribers
> of a group calling plan generally can identify the names and addresses of the
> users on their own group calling plan

*Id.* at 677 (citations omitted); *accord Knapper*, 2019 U.S. Dist. LEXIS 19210 at *13-15.

Indeed, subpoenaing cellular carriers and using a commercially-available reverse
directory database for purposes of identifying class members is common practice, and courts
have repeatedly approved both procedures in TCPA actions.  *See Mey v. Venture Data, LLC*,
No. 14-cv-123, Doc. 247 at 26; *supra* note 9 (collecting cases).

Then, using the names and contact information obtained from the cellular telephone
service providers and/or a reverse look-up, Plaintiff can send notice to the class.

**C.      Commonality Is Satisfied.**

The test for commonality is whether the class claims present "questions of law or fact
common to the class."  Fed. R. Civ. P. 23(a)(2).  This is another "low hurdle."  *Williams v.
Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).  Plaintiff need only show that the
class claims present "at least one issue whose resolution will affect all or a significant number
of the putative class members," which issue is "susceptible to class-wide proof." *See, e.g.*, *id.*
at 1355.  In other words, the class claims must "depend upon a common contention . . . capable
of class wide resolution—which means that determination of its truth or falsity will resolve an
issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, the class claims depend upon several common contentions that will be resolved on a class-wide basis "in one stroke" without the need for any individualized inquiries, including: (a) whether the phone calls were placed with the technology prohibited by the TCPA (*i.e.* an ATDS or artificial or prerecorded voice); (b) Defendants' policies and practices with respect to wrong number notations; (c) whether Defendants violated the TCPA; and (d) whether OHI is directly or vicariously liable for calls made by PFS or RMB. *See Northrup*, 2019 U.S. Dist. LEXIS 268 at *17-18 ("common legal questions include whether Defendants violated the TCPA"); *Palm Beach Golf*, 311 F.R.D. at 699 ("facts necessary to establish liability relate to Defendants' common course of conduct"); *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 690 (S.D. Fla. 2014) (holding in TCPA case "the legal questions that the instant matter presents will be common to all class members"); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 686 (S.D. Fla. 2013) ("Whether the provision of a phone number on admissions paperwork equates to express consent is a question common to all class members, because . . . all class members will prevail or lose together, making this another common issue to the class.").

### D. Typicality Is Satisfied.

"The focus of typicality is whether the class representative's interest is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation and bind them in a judgment on the merits." *Palm Beach Golf*, 311 F.R.D. at 696. "Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus . . . between the legal claims of the named class representatives and those

of individual class members to warrant class certification.'" *Ault v. Walt Disney World* Co., 692 F.3d 1212, 1216 (11th Cir. 2012) (citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278-79 (11th Cir. 2000)). "This nexus exists 'if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Ault*, 692 F.3d at 1216. "'The typicality requirement may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories.'" *Williams*, 568 F.3d at 1357 (alteration in original).

In this case, Plaintiff was subjected to the same pattern or practice as every other class member—*i.e.* Defendants' use of prohibited technology to place debt collection robocalls to cellular telephone numbers where Defendants' business records confirmed they called a wrong number. And Plaintiff's claim, like the claim of every other class member, is based on a single legal theory—*i.e.* that Defendants' conduct violated 47 U.S.C. §227(b)(1)(A)(iii).

In addition to being virtually identical to *Reyes*, *Knapper*, *Keim* and *Lagvine*, this class is strikingly similar to *Abdeljalil*, in which the court certified a TCPA wrong number class, holding that "plaintiff's claims are clearly typical of the proposed class, in that plaintiff and the proposed class members, who were not customers of defendants, seek relief based on defendant's use of an automatic telephone dialing system and/or an artificial or prerecorded voice for debt collection purposes where defendant's records indicate defendant had knowledge . . . that they were non-account holders." 306 F.R.D. at 309; *accord A Aventura Ctr., Inc. v. Med Waste Mgmt. LLC*, 2013 U.S. Dist. LEXIS 97879, at *10 (S.D. Fla. 2013) ("Aventura satisfies typicality as the course of conduct that produced its TCPA claim also produced the claims of the proposed class."); *Cordoba*, 320 F.R.D. at 601 (same);  Therefore,

typicality is satisfied.

**E.    Plaintiff and Plaintiff's Counsel Are Adequate.**

The adequacy element of Rule 23(a)(4) "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "Adequate representation is presumed in the absence of contrary evidence." *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002). Further, "[a]dequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as for the class." *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 672 (S.D. Fla. 2015).

Plaintiff understands her duties as class representative and has no interests antagonistic to the classes. Ex. 8, 25:17-26:14, 153:18-154:4, 184:4-185:9. In addition, Plaintiff is represented by counsel with extensive experience litigating TCPA claims and class actions under the TCPA. *See Declaration of Keith Keogh* ¶¶ 4-10, 16, attached as **Exhibit 13**; *Declaration of William Howard* ¶¶ 3, 8-11, attached as **Exhibit 14**. Plaintiff's counsel has been—and will continue to be—adequate counsel for the classes. *See City of Monroe v. Priceline.com, Inc.*, 265 F.R.D. 659, 668-69 (S.D. Fla. 2010). Therefore, the adequacy requirement is satisfied.

**F.    Common Questions Predominate.**

Rule 23(b)(3) does not require all issues presented in the case to be common among the Class, it only requires that common issues predominate over individual issues. *Klay*, 382

F.3d at 1254 ("'it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions'"), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). Common issues predominate "'if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . relief.'" *Williams*, 568 F.3d at 1357 (quoting *Klay*, 382 F.3d at 1255).

Here, the common questions presented directly affect the class members' ability to establish liability and obtain relief because proving whether a prerecorded or artificial voice or ATDS was used, whether Defendants had consent to make the calls, or whether OHI is liable for the calls will <u>each</u> directly impact every class member's effort to establish liability.

Thus, as is often true in TCPA cases, "there are no prickly individualized questions" that could predominate this action. *Manno*, 289 F.R.D. at 690. Instead, "the facts necessary to establish [TCPA] liability relate to Defendants' common course of conduct and the transmissions of the [calls], and not to issues with individual class members." *Palm Beach Golf*, 311 F.R.D. at 699 (finding predominance satisfied in a TCPA case).

Finally, common issues predominate with respect to the issue of prior express consent, notwithstanding any speculative or hypothetical argument to the contrary. As numerous courts have held in certifying wrong number TCPA classes, any speculative or hypothetical individualized issues regarding "prior express consent" do not defeat predominance where the class is limited to persons whose numbers were noted as a wrong number in the defendant's records and the notations will be verified through a carrier subpoena or similar process. *See Reyes*, 2018 U.S. Dist. LEXIS 106449 at *41-49; *Knapper*, 2019 U.S. Dist. LEXIS 19210 at

*11-15 (based on proposal involving carrier subpoenas, reverse-lookups and self-identifying affidavits, "the Court finds Plaintiff's proposed methodology for resolving consent or lack thereof on a class-wide basis sufficient"); *Abdeljalil*, 306 F.R.D. at 311 ("[P]laintiff contends that the issues surrounding consent are subject to common proof because the proposed search [of call records for 'wrong number' notations] will identify persons called by defendant's agent who were third parties. . . . This Court agrees with plaintiff."); *see also Johnson*, 315 F.R.D. at 502-03 (holding predominance satisfied by wrong number TCPA class, finding that any possible individual issues "can be efficiently addressed").[8]

Indeed, the only evidence of consent is OHI's policy of requiring *its patients—i.e.* the intended call recipients, <u>not</u> actual subscribers/users at the time of the call—to sign consent forms and the fact that OHI provided its patients' phone numbers to PFS and RMB to call. *See OHI Ans. to Interrog. 3* ("each patient is required to sign a Patient Contact Information Confirmation Sheet [OHI000102], which contains express consent language"), attached as **Exhibit 15**. Those consent forms do not purport to provide consent for Defendants to call third parties unrelated to the debts at issue, much less those whose telephone numbers are documented as a being a wrong number in Defendants' own records.

Thus, common issues predominate. *See Keim*, 328 F.R.D. at 686 ("the issue of whether Defendants obtained consent can be resolved in 'one stroke' because the evidence does not

---

[8] *See also Cordoba*, 320 F.R.D. at 602 ("Dish's claim that the putative class list contains 'hundreds' or 'a multitude' of non-actionable calls, is not supported by evidence. While there are potentially a number of individual issues, these issues appear to apply to only a small number of class members and are straightforward. These minor, peripheral issues do not defeat the predominance[.]") (quoting *Krakauer*, 311 F.R.D. at 399); *Mims v. Stewart Title Guaranty Co.,* 590 F.3d 298, 308 (5th Cir. 2009) ("Class certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct.").

support Defendants' claims of consent through an intermediary or by an agent at this time"); *Reyes*, 2018 U.S. Dist. LEXIS 106449 at *46 ("Given that BCA maintains that it 'only dials telephone numbers provided by patients' to its healthcare companies, then, at trial, BCA will likely argue that it had consent to call *all* such patients.") (citation omitted; emphasis in original); *Knapper*, 2019 U.S. Dist. LEXIS 19210 at *6-7 ("Whether Defendant used an ATDS or an artificial or prerecorded voice to allegedly call the putative class members would produce an answer that is 'central to the validity of each claim in one stroke.' . . . Likewise, whether consent was or was not given is a common question applicable to the class" based on proposed method to identify class using defendant's records and subpoenas, as is "whether each class members suffered the same injury").

Once again, any doubt will be addressed by the cellular carrier subpoenas to identify the name and address of the subscriber and user at the time of the call. A simple comparison of the data provided by the carriers to the names, addresses, and call data in Defendants' records will allow Plaintiff to remove any matches, thereby removing any person who was not a wrong number. As such, there will be no mini-trials or individual issues that predominate, but instead a simple administrative process.

**G.     The Class Action Mechanism Is Superior to Other Methods.**

"The focus of the superiority analysis is on 'the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs.'" *Palm Beach Golf*, 311 F.R.D. at 699 (citing *Klay*, 382 F.3d at 1269). In this case, requiring individual class members to file their own suits would deter some from enforcing their rights because the recoverable statutory damages are only $500 (or, up to $1500 if the Court trebles

damages) and the TCPA is not a fee shifting statute.  *See* 47 U.S.C. § 227(b)(3); *Mims*, 565

U.S. at 385-86 (acknowledging rarity of paying $350 filing fee to bring TCPA claim for $500).

Indeed, as the Southern District of Florida held in *Palm Beach Golf*:

> Given the large number of purported members in this suit and the similarity of
> their claims, disposition by class action is an efficient use of judicial resources.
> Moreover, the relatively small potential recovery in individual actions ($500 in
> the absence of a finding of willfulness) and reduced likelihood that plaintiffs
> will bring suit also weighs in favor of class resolution.

311 F.R.D. at 699; *Dickens v. G.C. Servs., L.P.*, 706 Fed. Appx. 529, 537 (11th Cir. Aug. 23,

2017) (abuse of discretion to find class action not superior when class members had little

incentive to prosecute their claims individually).  Here, the consolidation of thousands of

claims for relatively small statutory damages is the superior method of adjudication especially

as the TCPA is not fee shifting.

## VI.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an

Order certifying the proposed classes.

Dated: May 24, 2019

Respectfully submitted,

/s/ Theodore H. Kuyper
Keith J. Keogh (FBN 0126335)                    Heather H. Jones (FBN 0118974)
Theodore H. Kuyper (Pro Hac Vice)               William "Billy" Peerce Howard (FBN 0103330)
KEOGH LAW, LTD.                                 The Consumer Protection Firm, PLLC
55 W. Monroe Street, Suite 3390                 4030 Henderson Blvd.
Chicago, Illinois 60603                         Tampa, Florida 33629
(312) 726-1092                                  (813) 500-1500
(312) 726-1093 (fax)                            (813) 435-2369 (fax)
keith@keoghlaw.com                              Heather@TheConsumerProtectionFirm.com
tkuyper@keoghlaw.com                            Billy@TheConsumerProtectionFirm.com

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2019, I caused the foregoing ***Motion for Class Certification*** to be served upon all counsel of record via electronic filing using the CM/ECF system.

<u>  /s/ Theodore H. Kuyper       </u>