# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ANGELA MORGAN,                    CASE NO. 6:17-cv-01972-CEM-GJK

     Plaintiff,

v.

ORLANDO HEALTH, INC.,
G&G ORGANIZATION, LTD. d/b/a
PFS GROUP and RMB, INC.,

     Defendant.         /

### DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**MEMORANDUM**

Defendants Orlando Health, Inc. ("Orlando Health"), G&G Organization, Ltd., doing business as PFS Group ("PFS"), and RMB, Inc. ("RMB") (collectively "Defendants") file this Opposition to Plaintiff's Motion for Class Certification (the "Motion to Certify") (ECF 173), and in support state the following:

## I.    **INTRODUCTION**

Plaintiff's newly-minted class definitions seek to certify "wrong number" TCPA classes against Defendants, although multiple decisions within the Eleventh Circuit have rejected similar classes. *See, e.g., Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457–58 (M.D. Fla. 2018) (denying certification and holding "short of relying on a claimant's assertions, there is no way definitively to determine who actually answered the call from Defendant and stated `wrong number.'")

Plaintiff's expert, Robert Biggerstaff, has not identified any class members as of the date of the Motion to Certify. Not even one. He has not performed his proposed methodology for identifying class members on any data. Instead, he has stated only what he might be able to do if he receives further information. Moreover, Mr. Biggerstaff appears to be basing what he intends to do some day on a fundamental misunderstanding of PFS's account notes and RMB's records. This sheer speculation does not meet Plaintiff's burden to establish the elements of Fed. R. Civ. P. 23 or *Daubert*, and is the subject of Defendants' Motion to Strike filed concurrently herewith.

Even if this Court makes the leap and considers Plaintiff's proposed methodology, Plaintiff cannot demonstrate an ascertainable class such that individualized issues, including identification of subscribers and customary users of the phone numbers at issue (either of whom could have consented to phone calls), do not predominate.

Certification should be denied, as minimum, due to lack of predominance, lack of commonality, and lack of ascertainability.

{00116929;1}

## II.     BACKGROUND

### A.     Orlando Health obtains telephone numbers only from its patients.

Orlando Health is a private non-profit network of community and specialty hospitals based in Orlando, Florida.  Declaration of Michelle Farrell ¶ 7, attached hereto as Ex. A.  As part of the patient intake process, Orlando Health's hospitals collect written demographic information from each of its patients, including Protected Health Information ("PHI").  *Id.* ¶ 10. That information includes the patient's address, telephone number and email address, and it also includes the name, address, and telephone numbers of guarantors (such as parents, or employees who provide medical insurance to family members through employer-provided health insurance).  *Id.* at ¶¶ 10-12 & Exhs. 1-5.  That information, including telephone numbers, is confirmed verbally and in writing by patients and guarantors.  *Id.*  Since February 1, 2014, Orlando Health's hospitals have used a variety of forms to confirm patient and guarantor information, including telephone numbers.  *Id.*

Patients and guarantors often provide additional telephone numbers during the course of their relationships with Orlando Health's hospitals.  *Id.* at ¶¶ 14-16.  Any patient or guarantor can update their phone number or other contact information in person, by phone, email, or through Orlando Health's website.  *Id.* at ¶ 15. Orlando Health therefore obtains consent for calls to telephone numbers provided by patients or guarantors on its forms as part of its patient intake procedures.

### B.     How Orlando Health patients may revoke consent

Since December 21, 2015, Orlando Health has provided patients and guarantors with several options to revoke their consent to be contacted by telephone:  via telephone, email, fax, U.S. Mail, or in person.  *Id.* at ¶ 15.

### C.     Orlando Health's vendors

Orlando Health refers  patient accounts with unpaid balances to vendors such as PFS and RMB.  *Id.* at ¶ 19.  At all times relevant, PFS functioned as an extended business office ("EBO") for Orlando Health.  Declaration of Jason Brodman at ¶¶ 2-6, attached hereto as Exhibit B.

Orlando Health transmits telephone numbers provided by patients and guarantors and other account information to its vendors.  Farrell Decl. at ¶ 19.  Orlando Health does not use third party skip trace vendors for the purpose of locating additional contact information for patients. *Id*. at ¶ 15.  The only phone numbers provided to vendors were provided by patients and/or by guarantors.  *Id*.

Orlando Health's vendors can upload data to Orlando Health's collection system such that they can report back information relating to the accounts, including certain call dispositions and call results.  *Id*. at ¶ 20.  OHI does not require that its vendors use certain codes or phrases. *Id*. at ¶ 21.  Memorialization of interaction with patients or guarantors via telephone is generally documented in notations in freeform account notes.  *Id*. at ¶ 21.

### 1. PFS

PFS functions as an extended business office ("EBO") for healthcare providers nationwide, delivering customer service, billing, and payment solutions for its clients.   Brodman Decl. ¶ 2.  PFS is not a robocaller.  *Id.*  PFS does not engage in relentless telemarketing or debt collection calls.  *Id.*  PFS performs a vital customer service function for both consumers and health care providers by assisting patients in identifying sources of payment for their medical care, including health insurance, financial assistance programs and self-payment options.  *Id.*

PFS representatives communicate with a patient or guarantor only at a telephone number disclosed by the patient or guarantor to the health care provider and only if the health care provider has obtained prior express consent to call the number.  *Id.* at ¶ 3.

 Orlando Health transmitted information to PFS that included patient- or guarantor-supplied telephone numbers and, upon PFS's insistence, a field for Orlando Health to indicate consent.  *Id.* at ¶ 4.  PFS has a strict policy of immediately ceasing calls to a phone number if the recipient of the call states that it is a wrong number.  *Id.* at ¶ 3.

### 2. RMB

RMB is a provider of accounts receivable outsourcing and delinquent account recovery in the health care arena.  Declaration of James Patrick Meyers, ¶ 8, attached hereto as Ex. C. Pursuant to its February 2008 agreement with RMB, Orlando Health periodically sent RMB

information relating to overdue patient accounts.  Meyers Decl. ¶ 10.  These accounts included Maria R.'s account, which was placed with a phone number ending with 2301.  Meyers Decl. ¶ 11.

**D.    Facts specific to Maria R.**

On or about November 19, 2016, patient Maria R. filled out Orlando Health's Patient Contact Information Confirmation Sheet and provided the xxx-xxx-2301 phone number in association with her treatment.  Farrell Decl. at ¶ 24.  The consent form states as follows:

> "I confirm that I am authorized to use and provide this contact information.  I acknowledge that it is my responsibility to notify Orlando Health if my contact information changes.  If I have provided a cell phone number, or a number that is later converted to a cell phone number, *I consent to receive calls and messages at that number using text messaging, artificial or pre-recorded voice messages, and autodialing technology from Orlando Health and other health care providers involved in the care of the patient, and its and their agents and independent contractors (including but not limited to servicers and collection agents*).  Normal cell phone charges may apply.  This consent will remain in effect and apply to any and all of the patient's inpatient admissions and outpatient treatments at all Orlando Health facilities (including but not limited to Emergency Departments, physicians' offices, ambulatory care centers and outpatient treatment facilities) until revoked.  I understand that I can revoke this consent at any time by any reasonable method, including the following methods which are provided here for my convenience:
> -   By telephone at the following number: 402-650-3800/800-424-6998
> -   By email addressed to: billling@orlandohealth.com
> -   By fax to the following number: 407-605-8785
> -   By U.S. Mail, postage prepaid addressed to: 3090 Caruso Court, Ste. 20, Orlando FL, 32806
> -   In person:   By notifying any Orlando Health Business Office Representative."

OHI Patient Contact Information Confirmation Sheet (emphasis added).  *Id.* at ¶ 21 & Ex. 6.

Orlando Health sent PFS electronic information relating to Maria R.'s account including the 2301 number on or about February 3, 2017, along with confirmation of Maria R.'s consent to call that number.  *Id.* at ¶ 25; Brodman Decl. at ¶ 7.  PFS placed eight unanswered calls to the 2301 number.  Brodman Decl. at ¶ 7.  At the time of the calls, PFS did not know that M.R. was no longer using the 2301 number.  *Id.*

On April 5, 2017, when PFS called the 2301 number attempting to reach patient Maria R., Plaintiff Angela Morgan answered and informed PFS that it was the "wrong number." Consistent with PFS's policy to cease calling any number that the called party states is incorrect, PFS immediately stopped placing calls to the 2301 number and has not called the 2301 number since then. *Id.* at ¶ 8. PFS's account notes reflect the "wrong number" entry for April 5, 2017. Thereafter, the Maria R. patient account was returned to OHI, but a "wrong number" notation was never reflected in Orlando Health's notes. Farrell Decl. at ¶ 27 & Ex. 7.

Orlando Health sent RMB information relating to Patient Maria R., including the 2301 phone number or about June 2017. *Id.* at ¶ 28. RMB placed two calls to the 2301 phone number. Plaintiff later called RMB to notify RMB it was calling the wrong number, at which time RMB notated the account and ceased contacting the 2301 phone number. *Id.* at ¶ 29 & Ex. 9. Orlando Health did not know that Maria R. was no longer using the 2301 number at the time of these calls. *Id.*

E.    **Plaintiff's pre- and post-expert Report opinions**

Pursuant to the Court's Amended Scheduling Order, on February 22, 2019, Plaintiff served the expert report of Robert Biggerstaff (the "Biggerstaff Report"). Declaration of Stephen A. Watkins, ¶ 3, attached hereto as Ex. D. Plaintiff not only relies on the Biggerstaff Report in support of her Motion, but also presents post-Biggerstaff Report opinions.

1.    **Improper Biggerstaff Report opinions**

The Biggerstaff Report does not reflect any analysis of call data. The Biggerstaff Report and Plaintiff's Motion assert RMB calls to wrong numbers can be identified from a spreadsheet of a list of phone numbers provided from Orlando Health to RMB (RMB000230). This list contains no call data, only dates of when phone number flags were changed and the number of calls while telephone number was coded with an * (cell phone with consent to call). Taylor Report at ¶ 12, attached hereto at Ex. G. Mr. Biggerstaff's Report repeatedly speculates as to what he could do if he had additional RMB data. Biggerstaff Report at ¶ 19.

Mr. Biggerstaff similarly speculates as to what he could do if he received call data relating to PFS. Biggerstaff Report at ¶ 59.

Plaintiff admits that the court in *Tillman v. Ally Fin. Inc.*, No. 2:16-CV-313-FTM-99CM, 2017 WL 7194275, at *7–8 (M.D. Fla. Sept. 29, 2017) denied certification where the plaintiff did not have the call records showing wrong number calls. Motion at 9-10. Similarly, Plaintiff did not have call data from Orlando Health (showing calls from PFS or RMB) or call data directly from RMB at the time of the Biggerstaff Report. This Court held that Plaintiff was not diligent in seeking this data (March 14, 2019 Order at 4-5). Therefore, the Post-Biggerstaff Report opinions based on post-report call data should be stricken. Plaintiff's case therefore falls in line with the very cases it tries to distinguish—cases that "did not involve business records that already identify the wrong number calls" (Motion at 9)

### 2.    Improper Post-Biggerstaff Report opinions

Employing analysis not asserted in the Biggerstaff Report, Plaintiff asserts that PFS calls to wrong numbers can be identified by simply counting the notation "Oph#" in Orlando Health records. Motion at 5. "Oph#" merely means a change in or removal of a number, **not a change due to wrong number**. Brodman Decl. at ¶¶ 12-20. PFS could change a number for over a dozen reasons, including a requests for a change to or from patient from or to guarantor. *Id.* PFS could also remove a number for many reasons, including guarantor death or disability. *Id.*

Also employing improper post-Biggerstaff Report analysis, Plaintiff asserts that Orlando Health assigned 179 numbers to RMB whereby a "wrong number" notation was already identified in Orlando Health's records, but does not provide an affidavit of Mr. Biggerstaff or anyone else in support of this statement. Motion at 5, n. 3.

These unsupported and improper opinions are the subject of Defendants' Motion to Strike filed concurrently herewith.

## III.    PLAINTIFF'S CLASSES

Plaintiff's Motion asserts different classes that those stated in her Third Amended Complaint ("TAC"). Her Motion asserts the following classes:

**OHI Class**
(1) All persons in the United States (2) to whose cellular telephone number (3) Orlando Health or anyone acting on its behalf placed a non-emergency telephone call (4) using substantially the same system(s) that were used to telephone

Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present and (6) where any Defendant's records note said telephone number was a wrong number.

### RMB Class

(1) All persons in the United States (2) to whose cellular telephone number (3) RMB placed a non-emergency telephone call relating to an Orlando Health debt (4) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present sand (6) where any Defendant's records note said telephone number was a wrong number.

### PFS Class

(1) All persons in the United States (2) to whose cellular telephone number (3) PFS placed a non-emergency telephone call relating to an Orlando Health debt (4) using substantially the same system(s) that were used to telephone Plaintiff or a prerecorded or artificial voice (5) from November 16, 2013 through the present and (6) where any Defendant's records note said telephone number was a wrong number.

Motion at 6.

## IV.   ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  A class may not be certified unless plaintiff is able to demonstrate, following a "rigorous analysis," that he has complied with all of the requirements of Rule 23.  *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009).   Plaintiff bears the burden of showing that the four requirements of Rule 23(a)— numerosity, commonality, typicality, and adequate representation—are all met.  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).  Because Plaintiff seeks certification of a damages class under Rule 23(b)(3), she must also show (i) that common questions predominate over questions that require individual proof and (ii) that a class action is superior to other methods for fairly and efficiently adjudicating the controversy.  *Vega*, 564 F.3d at 1265.  As shown below, Plaintiff cannot possibly meet this burden.

### A.   Wrong number TCPA classes have been rejected by other Courts

Plaintiff's statement that "class certification is the norm in 'wrong number' TCPA cases" lacks any basis.  Several decisions within the Eleventh Circuit have denied certification of such

classes: *See Wilson, Tillman, supra*. Moreover, as noted by one district court, "District courts have split on the propriety of class certification in similar 'wrong number' TCPA actions." *Revitch v. Citibank, N.A.*, No. C 17-06907 WHA, 2019 WL 1903247, at *3 (N.D. Cal. Apr. 28, 2019). The Court in *Revitch* denied certification of such a class, following the line of cases represented by *Tomeo v. CitiGroup, Inc.*, No. 13-cv-4046, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018). All of Plaintiff's cited authority is distinguishable as those actions did not involve a Plaintiff who sought to certify a class with a placeholder expert report devoid of actual analysis.

**B.**     **Mr. Biggerstaff's speculation as to how predominance and ascertainability might be determined fails to sustain the Plaintiff's burden.**

Defendants have filed a Motion to Strike the Biggerstaff Report and post-Biggerstaff Report analysis because these opinions fail to meet the *Daubert* standard for admissibility. Moreover, the post-Biggerstaff Report analysis is untimely per Fed. R. Civ. P. 37(c)(1). If the Court grants Defendants' Motion, Plaintiff's Motion to Certify must be denied because those speculative opinions are the Plaintiff's only evidence supporting key elements of Rule 23.

District courts in the Eleventh Circuit must perform a "full Daubert" analysis "when an expert's testimony is critical to the class certification." *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin'l Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014); *See also Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 376 (N.D. Fla. 2017) (holding "In light of the Court's Daubert rulings excluding the opinions of Dr. Sawyer, Dr. Flowers, and Dr. Wade… Plaintiffs are unable to meet their burden for class certification."). The statement of an TCPA expert about what they might do should be stricken as speculative. *See Southwell v. Mortg. Inv'rs Corp. of Ohio,* No. C13-1289 MJP, 2014 WL 3956699, at *4 (W.D. Wash. Aug. 12, 2014) (striking expert declaration in TCPA class action on the grounds it was ***"entirely prospective; i.e., it simply describes what she intended to do with the data provided by Plaintiffs.***") (emphasis added).

Without the Biggerstaff Report and post-Biggerstaff Report opinions, Plaintiff cannot satisfy her burden to demonstrate by a preponderance of the evidence any of the elements of Rule 23. Her Motion to Certify should be denied on this ground alone.

### C.    Plaintiff's putative classes lack commonality and predominance

Even if the Biggerstaff Report is considered, certification should be denied because the Plaintiff's putative classes lack commonality and predominance.  The "common contention" underpinning a finding of Rule 23(a)(2) commonality "must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Shamblin v. Obama for Am.,* No. 8:13-CV-2428-T-33TBM, 2015 WL 1909765, at *6-7 (M.D. Fla. Apr. 27, 2015) (citing *Wal-Mart Stores,* 564 U.S. 338)).

Although similar to the commonality element of Rule 23(a)(2), "the predominance criterion is far more demanding." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997) (citation omitted).  To certify a class under Rule 23(b)(3), "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009).  "Predominance 'is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega*, 564 F.3d at 1278. "'Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3).'" *Collins v. Erin Capital Management, LLC*, 290 F.R.D. 689, 699 (S.D. Fla. 2013) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004).

It does not matter that consent may be an affirmative defense to be demonstrated by the Defendants.  It still must be considered in the predominance analysis. *Gene And Gene LLC v. BioPay LLC,* 541 F.3d 318, 327 (5th Cir. 2008).

Plaintiff asserts individualized issues regarding "prior express consent" do not defeat predominance where the class is limited to persons whose numbers were noted as a wrong number in the Defendants' records and the notations will be verified through a carrier subpoena or similar process.  (Motion at 22)

However, the unreliability of "wrong number" designations, the various manner in which Orlando Health obtains consent, the lack of common proof of the subscriber and/or the customary user of cell phones, the variety of persons who can provide consent, the validity of revocation, and whether or not Defendants reasonably relied upon the proof of consent at the time of the call all present individualized inquiries that will defeat any showing of commonality and/or predominance.

Orlando Health's hospitals obtain telephone numbers directly from patients and guarantors, and supply those numbers to its vendors, including PFS and RMB.  Farrell Decl., ¶¶ 32-33 & Ex. 10; Brodman Decl. ¶¶ 3-7.  All patients and guarantors consent to be contacted by telephone, until (and unless) they revoke such consent.  Certification will result in a protracted trial replete with individual evidence which demonstrates that most class members consented to be called, and that there is no liability under the TCPA.  Lack of (or revocation of) consent cannot be easily determined on a class-wide basis.  For that reason alone, certification should be denied for lack of commonality and lack of predominance.

All of Plaintiff's cited authorities are distinguishable, as all are based on different factual records.  First, none of the Plaintiff's certification decisions relied on a speculative placeholder expert report.  Mr. Biggerstaff readily admits his report is incomplete.  He states, "If Orlando Health, Inc. ("OHI") were to produce the [PFS] Notes data that I understand was uploaded into OHI's Affinity system, I can perform the foregoing analyses on the [PFS] data..."  Biggerstaff Report ¶ 59.  He states the same with respect to RMB.  Biggerstaff Report, ¶ 19.

Second, the Court in *Wilson*, 329 F.R.D. at 458 n.4, distinguished the Plaintiff's primary authority, *Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668 (S.D. Fla. 2018)*, on factual grounds. The *Wilson* court noted that in *Keim,* the defendant's expert merely pointed out that phone carriers are under no obligation to maintain historical account records, not whether such information is obtainable at all.  *Id*.  In contrast, not only do Defendants' experts testify to the unavailability of historical account records, Defendants have provided carrier affidavits which demonstrate that historical records are not available, particularly with respect to user information and especially with respect to prepaid customers.  See Exhs. 1-5 to Watkins Decl.

The Court in *Wilson* also noted "the proposed solution [in *Keim*] of asking subscribers to provide user information once more leaves a defendant at the mercy of prospective class members." *Id.* Plaintiff proposes the *Keim* procedure here, asking the court to rely on unscrutinized claim forms for $500 or $1,500 per call. But individual claim forms only illustrate that the putative class is replete with individual factual issues

The Court in *Wilson* factually distinguished wrong number class certification decisions in *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 3145807 (S.D. Fla. June 26, 2018) and *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 311 (S.D. Cal. 2015), noting that those defendants did not have actual proof of consent or that "consent could have been obtained in many different ways." *Wilson*, 329 F.R.D. at 460. (citation omitted). As shown below, Orlando Health can demonstrate consent by patients and guarantors, and can demonstrate that consent was obtained in different ways over the lifespan of the patient relationship.

1.      **The different ways Orlando Health obtained consent in different ways during the lifespan of the patient relationship defeats predominance**

In *Gene & Gene,* 541 F.3d at 329, the Fifth Circuit held that "the district court abused its discretion in certifying the class," emphasizing that "the predominant issue of fact is undoubtedly one of individual consent" and if "there is no class-wide proof available to decide consent," then "only mini-trials can determine this issue." *Id.* at 329–30.

It is undisputed that Orlando Health and its vendors had consent to call its patients and guarantors. Where a caller obtains telephone numbers directly from its intended recipients (as here), courts have generally held a "wrong number" class should not be certified given that resolution of prior express consent would require individualized inquiries. *See Revitch*, 2019 WL 1903247, at *3. As stated by Judge Jung in *Wilson*: "[I]t is important to note any inquiry's starting point: Rather than engage in random robocalling, Defendant only calls numbers in its records." *Wilson*, 329 F.R.D. at 460. Thus, the defendant's listing "wrong number" in its records was not "a proxy for no consent." As in *Wilson*, our case "is not a case where a defendant sprayed robocalls across a nonconsenting public." *Id.*

In denying certification, the Court in *Wilson* held the "determinative—and most complex, fact-specific—aspect of each case [was] how that number entered Defendant's records and, related, the issue of consent." *Wilson*, 329 F.R.D. at 459 (citing *Jacobs v. Quicken Loans, Inc.*, No. 15-81386-CIV, 2017 WL 4838567, at *2 (S.D. Fla. Oct. 19, 2017) ("Pivotal to this analysis is whether [the plaintiff] has met his burden to show that the issue of consent for the challenged telephone calls can be resolved by common, classwide evidence or whether it is an individualized issue.") (citation omitted).

Similarly, in *Shamblin*, 2015 WL 1909765, at *7, the Court denied certification on the grounds that determination of prior express consent by its nature required an individualized inquiry for each class member, and therefore the class lacked predominance. In *Wilson*, the Court noted although Defendant only obtained consent from customers in connection with a purchase on credit, defendant "could still demonstrate consent a variety of ways." *Id.* at *5. Similarly, Orlando Health can demonstrate consent via a variety of ways. Although patients and guarantors provided initial consent when they executed a form granting Orlando Health the consent to contact them, consent could subsequently be provided at different points in the lifespan of the patient-Orlando Health relationship. Farrell Decl. ¶¶ 14-16, 22-23.

Therefore, this case does not present a case whereby consent for the class can be determined by a simple review of an initial consent form for the entire class. Certification should be denied for lack of predominance.

### 2. Plaintiff cannot sidestep consent inquiries by relying on unreliable "wrong number" notations

Plaintiff mischaracterizes both the pre- and post-Biggerstaff Report opinions to assert that analysis of notations in Defendants Orlando Health and RMB records can meet her burden establish the Rule 23 elements. Even if these opinions are not excluded, they fall far short of proving, by a preponderance of the evidence, that consent (or lack thereof) can be litigated through classwide proof.

The Biggerstaff Report does not contain any analysis of class data at all—this means there was no analysis of "wrong number" notations in the Biggerstaff Report. His analysis with

respect to Defendant RMB generally consisted of counting the number of times a phone number was called with a consent to call notation.  Taylor Report ¶ 31.  Mr. Biggerstaff did not review any call data with respect to PFS.  Biggerstaff Report, ¶ 59.  Plaintiff should be limited to the Biggerstaff Report—not opinions from class data subsequently produced.  To the extent Plaintiff claims that she should not be prejudiced by discovery delays regarding class data, this type of argument was expressly rejected in *Tillman*.  2017 WL 7194275, at *8.  In that case, the plaintiff asserted that the court refused to compel the defendant to produce certain class discovery.  The court in *Tillman* ultimately held this was of no importance because "even if plaintiff received the requested information and documents it would still not ameliorate the fact that individual issues predominate, i.e., *a search of Ally's records would not reveal whether the call recipients who claimed "wrong number" in fact had revoked their consent to call*." *Id.* (emphasis added).

With respect to the improperly submitted post-Biggerstaff Report analysis, Plaintiff's expert admits he has not identified any "wrong numbers" in RMB data—"Now, I don't say whether that is a date that it became a wrong number or not."  Transcript of April 22, 2019 Deposition of Robert Biggerstaff at 23:11-12, attached hereto as Ex. E.  Regardless "B" or "Never Call" in RMB records does not necessarily mean "wrong number."  Similarly, with respect to PFS, he concedes, "I have no idea what OPH stands for."  Biggerstaff Depo. at 85:11-12.  OPH# in Orlando Health records does not mean "wrong number."  Brodman Decl. ¶¶ 12-20; Taylor Decl. ¶¶ 29-31  Plaintiff, not Biggerstaff, asserts B and OPH# means "wrong number."

That Biggerstaff does not assert B and OPH# mean "wrong number" is confirmed by his acknowledgement of likely "false positives" when using B and OPH# as a starting point to ascertain class members.  His solution is to perform a vague technology-assisted key word proximity "iterative" process to address issues such as false positives, that he admits he has not yet conducted on the class data.  Biggerstaff Depo. at 31:17-25 through 34:1-24; 95:3-25; 96:1-14; Biggerstaff Report ¶ 29.  This search for false positives is required as a statement of "wrong number" is not always accurate.   Sponsler Report ¶¶ 68-76, attached hereto as Exhibit F.

Judge Steele in *Tillman*, 2017 WL 7194275, at *7–8, rejected use of free form account notations of "wrong" to locate allegedly "wrong number" calls.  In denying certification, the

Court in *Tillman* noted that there were a "a wide variety of circumstances under which the free form notes 'wrong number' and 'do not call' may be entered into Ally's system that have nothing to do with the validity of the underlying phone number." *Tillman*, 2017 WL 7194275, at *7–8.  It noted that the defendant had "offered evidence that in the debt collection industry "wrong number" oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though the correct number was called, as a way to avoid further debt collection." *Id.*  See Sponsler Report ¶ 69 (noting "in debt collection, it is also common for a patient who has provided the correct telephone number to answer a call from a medical debt collector/creditor by saying that it has dialed the "wrong number"); Meyers Decl. ¶ 24 (same).

Therefore, the Court in *Tillman* reasoned, "'wrong number' and 'do not call' notations are insufficient to establish on a class-wide basis without individualized inquiry that defendant made a call to a number in violation of the TCPA." *Id.* citing *Babineau*, 576 F.3d at 1191. (noting that a class should not be certified if it appears that most of the plaintiffs' claims have highly case-specific factual issues).  Defendants' case here is even stronger than the defense in *Tillman*.  In *Tillman*, the starting point was "wrong number" notations.  In our case, the starting point of OPH# with respect to PFS does not mean "wrong number" at all.  "B" with respect to RMB does not always mean a live call whereby someone is told "wrong number."  Meyers Decl. ¶¶ 23-25. *See also Tomeo*, 2018 WL 4627386, at *10 (denying certification and recognizing unreliability of "wrong number" designations); *Davis v. AT&T Corp*, 2017 WL 1155350, at *6 (S.D. Cal. 2017) (same).

In line with this reasoning, in denying certification in *Wilson,* the Court noted that although "[u]ndoubtedly Defendant called some wrong numbers," it was quite likely that a defaulting customer may reply with "wrong number" when the customer answers a call from the creditor collecting a past-due debt. *Wilson,* 329 F.R.D. at 459.  "Or someone in the customer's household might intentionally mislead the caller on behalf of the defaulting customer." *Id.*

Where a defendant can demonstrate that a significant portion of putative class members may have provided consent, certification is inappropriate, because individualized inquiries relating to consent predominate. *See, e.g., Johnson v. Yahoo*, No. 14 CV 2028, 2018 WL

835339, at *2 (N.D. Ill. Feb. 13, 2018).  In decertifying the class in *Johnson*, the court noted that "Defendant now has evidence sufficient to justify an individual consent inquiry for a significant percentage of the class (perhaps between 20 to 25%, maybe more)" *Id.* at *3.  Prior to Plaintiff's improper post-Biggerstaff Report analysis, Orlando Health's expert John Taylor identified two examples of "false positives" (one relating to RMB and one relating to PFS) from a sample of five accounts which would result from the  Plaintiff's flawed methodology (40%).  Taylor Report, ¶¶ 22-23; Taylor Decl. ¶ 38, attached hereto as Exhibit H.  Plaintiff claims that the post-Biggerstaff Report opinions of 16,051 OPH# in Orlando Health records means 16,051 wrong number calls.  Taylor's review of these records reveals this assertion is inaccurate.

Just as in *Tomeo*, 2018 WL 4627386, at *9, "Taylor supports his opinion with specific evidence."  Taylor's analysis found zero wrong number calls associated in one random pull of 100 Orlando Health records that included 29 OPH# notations.  Taylor Decl. ¶ 34.  In his second pull of all OPH# accounts, Taylor found 71 OPH# notations that were not associated with "WN" or "Wrong Number."  Taylor Decl. ¶ 35.   The remaining 29 would require an individualized inquiry as to the reliability and circumstances of the wrong number notation. *Id.* at ¶ 35-37; Brodman Decl. ¶ 14.  Regardless, these findings are well above the 20% error rate that decertified the class in *Johnson*, and the 15% error rate that precluded certification in *Tomeo,* 2018 WL 4627386, at *9.

Taylor's review also shows that Biggerstaff's reliance on RMB000230 (which does not contain dates and times of calls) is an absurd starting point for analysis that Plaintiff contends ends in the assertion that there were 179 accounts Orlando Health assigned to RMB with a wrong number notation.  Taylor Decl. ¶ 24.  Plaintiff does not explain how the 179 number was determined.  As Taylor attempted to back into the basis for the 179 number, this only resulted in confirming Biggerstaff counted data rows rather than calls to obtain Biggerstaff's initial "120,000 calls" number.  Taylor Decl. ¶¶ 18-22.  Using that apparent methodology, Biggerstaff overcounted calls by 118,831.  Taylor Decl. ¶ 23.

Moreover, at trial, reliance on these hearsay statements of "wrong number" would be barred.  Evidence may not be used in a class action to give "plaintiffs and defendants different

rights in a class proceeding than they could have asserted in an individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048, 194 L. Ed. 2d 124 (2016). While Orlando Health's business records are subject to a hearsay exception (Fed. R. Evid. 803(6)), as any "wrong number" statement in Orlando Health's records cannot be used to prove the truth of the matter asserted:  that the number is, in fact, a wrong number. Fed. R. Evid. 801(c).

"[I]n the context of determining class certification, the evidence rules are relaxed because it is a determination made by the court, not a jury." *Shamblin*, 2015 WL 1909765, at *4. Defendants are not asking the Court to strike this evidence. Defendants merely assert that such notations would not be admissible at trial as evidence of "wrong number." Given that a self-serving affidavit of potential class members is barred by *Karhu*, *infra*, *Wilson*, *supra*, and general due process, this issue of hearsay "wrong number" notations presents issues of predominance and superiority (lack of manageability). Plaintiff's proposal to merely identify "wrong number labels" is a non-starter for attempting to establish a class of persons who did not consent to be contacted. Certification should be denied for lack of predominance.

3.   **Plaintiff's speculation on how she would use carrier subpoenas to establish her class does not meet her burden**

Although Mr. Biggerstaff has speculated that he would use carrier subpoenas to identify class members, he has not yet received responses to Plaintiff's subpoenas. As set forth in Orlando Health's Motion to Strike, Mr. Biggerstaff's opinions on this methodology are unreliable. *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473 (S.D. Cal. 2014) (denying TCPA class certification due in part to anticipated difficulty with reliable subpoena responses)

The proposal in *Keim*, 328 F.R.D. at 679 included "the use of both carrier subpoenas and reverse-lookups for any membership information not captured by the subpoenas." However, Mr. Biggerstaff rejected any intention of using reverse lookup. Biggerstaff Depo. at 45:13-23. Plaintiff's assertion that she will use reverse lookup (Motion at 16) would not be performed by her expert. Regardless, use of reverse lookup is inherently unreliable. Taylor Report, ¶¶ 33-41; Sponsler Report, ¶¶ 33-65.

Moreover, the Court in *Keim* noted the lack of "record support" regarding lack of utility of carrier subpoenas. *Keim* 328 F.R.D. 668 at 678. In our case, Defendants have presented a substantial factual support regarding why subpoenaing of carrier records does mitigate the individualized inquiries whether respect to the individualized determination of all subscriber and users at the time of call, and whether or not any of these persons consented. See Exhibits 1-5 to Watkins Decl.

Either the current subscriber or non-subscriber customary user of the phone can give consent under the TCPA. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7999 (2015). However, the only information a carrier generally possesses is the subscriber as of today. Sprint, AT&T, Verizon, U.S. Cellular, and T-Mobile all report that the user information it receives on pre- and post-paid accounts is generally at the discretion of the subscriber. See Exhibits 1-5 to Watkins Decl. Lack of subscriber information is more pronounced with prepaid accounts. *See, e.g.*, Keep Decl. ¶¶ 8-9, Schmidt Decl. ¶ 2, Cauldwell Decl. ¶2, attached as Exhs. 1, 3, 5 to Watkins Decl.

Moreover, often carriers cannot identify subscribers or customary users of post-paid cellular plans. This is due to the use of family and other "group" calling plans—i.e., plans with multiple telephone lines under a single "master" subscriber/account. See Likely Decl. ¶ 7 (Ex. 2 to Watkins Decl.); Schmidt Decl. ¶ 5; Sponsler Report, ¶¶ 51-53, 86-94. What is relevant in a TCPA class action is identifying the subscriber or customary user of a phone number at the time of the phone call during the four-year class period. Even if Plaintiff's expert received responses to the subpoenas, he would not be able to properly identify all of the authorized subscribers and regular users of the subpoenaed phone numbers at the date and time of the call over the four-year period.

Regardless, Plaintiff's type of proposal was summarily rejected in *Wilson,* in part as it would not consistently identify users of the cell phone:

> "Simply considering what Plaintiff wants to do shows the problem: Plaintiff says first identify the "wrong numbers" listed in Defendant's calling records. That can be done. Plaintiff then claims her expert can divine the subscribers and affidavits can be mailed to those addresses to determine those with standing. **For example, Plaintiff, an authorized user, is shown on no phone records but does have**

**standing. But Plaintiff's grandmother, the subscriber and payer of the unlimited calling plan, has no standing.** This determination is highly doubtful and the self-attestation process has been rejected by other courts. See Karhu, 621 F. App'x at 948-49. Worse yet, it ignores the real hole in this case: deriving consent. A mail-in affidavit for a $ 45,000 claim is not going to work in this class setting. ***Consent requires an individualized inquiry, especially when the source list, by definition, is consented as with credit applications***."

*Wilson*, 329 F.R.D. at 460–61 (emphasis added).  *See also Bridge v. Credit One Fin.*, 294 F.

Supp. 3d 1019, 1040 (D. Nev. 2018) (noting difficulty in ascertaining customary users of cell

phones and holding plaintiff's TCPA class lacked predominance); Sponsler Report, ¶¶ 86-94.

Plaintiff only subpoenaed the relevant phone numbers ten days before filing her Motion

to Certify.  Her expert can only speculate about what he can do with these phone numbers--"Like

I said, it's an iterative process.  I get the subpoena results back, and we start matching on names,

and then we see if we have a lot of hits and we're good or we have a lot of misses and we need to

go on to something else."  Biggerstaff Depo. at 74:18-23.

Plaintiff has not met her burden to identify <u>all</u> persons who could provide consent—the

subscriber and the customary user.  Therefore, questions of consent will predominate.

### 4.  The fact different persons could have provided consent defeats predominance

Where "[C]onsent could be given by someone other than the subscriber, such as a third-

party affiliate, or spouse of a call recipient," this argues against certification. *Jacob*, 2017 WL

4838567, at *3. *See also Davis,* 2017 WL 1155350 at *6 (holding if "[d]efendant's customer

provided a number belonging to another person, such as a spouse or other family member, an

inquiry into that customer's authority to provide consent to call that number would be required.")

Particularly in the context of medical debt, consent to be called could have been provided

by someone other than the patient.  In *Mais v. Gulf Coast Collection Bureau, Inc*., 768 F.3d

1110, 1113 (11th Cir. 2014) (wife of an ill husband provided consent to be called on behalf of,

and as agent for, her husband).   In *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 559 (D. Colo.

2014), the Court refused to certify a TCPA class where the Mr. Biggerstaff did not offer a

method to "exclude household members and familial relationships" when identifying persons

who did not consent to be called.  Given the number of persons that could have provided consent for a particular phone number, Plaintiff's class lacks predominance.

### 5. Determining if and when patients revoked consent presents too many individualized inquiries to satisfy predominance

Plaintiff's reliance on counting OPH# (in Orlando Health records relating to PFS) and counting the change flags in RMB data (which lacks any call data) is an invalid starting point for analysis.  It ignores the fact that (1) a phone number could have been provided at various times in the lifespan of the patient relationship and (2) that Orlando Health specified five distinct revocation procedures.

When the parties agree to specific revocation procedures, only revocation in line with those procedures is valid.  The leading TCPA decision out of the D.C. Circuit Court of Appeals has recently held, "Nothing in the Commission's order thus should be understood to speak to parties' ability to agree upon revocation procedures." *ACA v. FCC*, 885 F.3d 687, 710 (D.C. Cir. 2018).  Beginning in December 2015, Orlando Health's patients, including Maria R., signed forms with specific TCPA language and specifying five different ways consent could be revoked. Per *ACA*, those patients were required to revoke consent in the manner identified to be effective Identification of persons called after valid revocation would require an account by account analysis as to whether consent was revoked in line with the manner specified by Orlando Health.

Determination of if and when consent was revoked for a particular class member is another individualized inquiry that predominates.  Plaintiff's class fails on this ground.

### 6. Determination of whether each call was made with reasonable reliance will overwhelm this litigation

On March 25, 2014, the Eleventh Circuit in *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014) held that "called party" did not mean "intended recipient. Subsequently, in the FCC's 2015 Ruling, the FCC addressed the scope of liability for a call to a reassigned number. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7971-72 (2015).  The FCC created a one-call "safe harbor" for those "callers who make calls without knowledge of reassignment and with a reasonable basis to

believe that they have valid consent to make the call[.]" *Id.* at 8000. *Osorio* predated the 2015 FCC ruling and was acknowledged by the FCC in that ruling. *See* 30 FCC Rcd. at 7997. Therefore, the "one free call" rule applied in this Circuit.

On March 16, 2018, the D.C. Circuit in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) invalidated the FCC's one-call "safe harbor" rule for reassigned numbers and "set aside the Commission's treatment of reassigned numbers as a whole." 885 F.3d at 708-09. Subsequent to *ACA*, reasonable reliance has been held to be a defense to TCPA liability. *See Roark v. Credit One Bank, N.A.*, No. CV 16-173 (PAM/ECW), 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018) (holding that "to determine whether there has been a violation of this section of the TCPA under current authority, the Court must consider the reasonableness of the caller's reliance on a prior number holder's express consent.")

The FCC has now adopted new rules to establish a reassigned numbers database and create a safe harbor from TCPA liability for inadvertent calls to recycled numbers. *In the Matter of Advanced Methods to Target & Eliminate Unlawful Robocalls*, No. CG17-59, 2018 WL 6590244, at *1 (Dec. 13, 2018). Per *Roark*, Defendants assert that, at a minimum, the calls to the class prior to December 13, 2018 are potentially subject to a reasonable reliance defense.

In our case, the patient Maria R. provided the 2301 on a form on November 19, 2016 and stated that the 2301 number was hers. Maria R. Depo. at 41:19-25, 42:1-2, attached hereto as Ex. K. Plaintiff asserts that the 2301 number has been her number since August of 2016. Plaintiff Depo. at 48:22-25, 49:1-6, attached hereto as Ex. J. Plaintiff's case presents an issue of whether or not the calls to her were made with reasonable reliance. As the starting point for all of the phone numbers in this case are patient/guarantor intake forms, determination of whether there was reasonable reliance to call any putative class member would overwhelm this litigation.

### 7.    Lack of predominance suggests lack of commonality

Plaintiff asserts that the common questions in this case are (1) whether Defendants had consent to make the calls (2) whether OHI is liable for the calls and (3) whether Defendants use an artificial or prerecorded voice. Motion at 22. For the same reasons Plaintiff's classes lack predominance, they lack commonality. *See Wilson*, 329 F.R.D. at 460 n.6 (holding "These same

considerations [precluding predominance] might also preclude a finding that Plaintiff has satisfied the commonality requirement of Rule 23(a).")

In particular, whether Defendants had consent to make the calls presents an individualized inquiry. Plaintiff asserts she has established commonality pursuant to *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 690 (S.D. Fla. 2015) (Motion at 22). However, contrary to Plaintiff's assertions (Motion at 23), consent to call is not simply a matter of the initial intake forms provided to patients and guarantors. Just as in *Wilson*, 329 F.R.D. at 460, Defendants have "put forth sufficient evidence that consent could present itself a variety of ways," during the lifespan of the Orlando Health-patient relationship." [*See* Section IV.C.1 *supra*] "This fact distinguishes Plaintiff's case from *Manno* and its line of cases." *Id.* Plaintiff's cited authorities *Keim*, *Reyes* and *Abdeljalil* in support of commonality similarly fail, as set forth above. *See* Section IV.C.1 *supra*]

Plaintiff has failed to meet her burden to show commonality, particularly with respect to "common proof" of no prior express consent. Her classes in this regard fail.

### D. Plaintiff's classes lack ascertainability

Many of the individualized inquiries with respect to Plaintiff's classes that predominate also defeat ascertainability. A class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an "administratively feasible" way. *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787-88 (11th Cir. 2014). "Identifying class members is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry." *Id.*

The Court in *Wilson*, *supra*, speculated that where a plaintiff changed the class definition (similar to this case) to eliminate the phrase "did not have prior express consent," this was to avoid individualized inquiries at the ascertainment stage. *Id.* at 459 However, such an amendment "only delays the necessary, fact-intensive inquiry into consent." *Id.*

Plaintiff's newly minted class definitions require determination as (1) "to whose cellular telephone number" the call was made; (i.e. the regular user and/or subscriber); (2) that the person was called; and (3) "where any Defendant's records note said telephone number was a wrong

number." Plaintiff cannot meet her burden to establish an administratively feasible method of identifying any of these three elements.

As far as reliably identifying who was called, Orlando Health only makes calls to telephone numbers which are provided to its hospitals by its patients. Plaintiff's expert has not stated a credible methodology to avoid individualized inquiries to determine whether putative class members were a subscriber or customary user at the time of the call at issue. Both *Wilson* and *Bridge* make it clear that there is no common way to determine the customary user of a phone number at the time of the call. *See, e.g., Wilson*, 329 F.R.D. at 457–58 (holding "short of relying on a claimant's assertions, there is no way definitively to determine who actually answered the call from Defendant and stated "wrong number.") Plaintiff's reliance on carrier subpoenas was rejected in *Smith*, 297 F.R.D. at 473 and is undercut by the carrier declarations to the contrary that show historical subscriber and particularly user information over a four year historical period are difficult to ascertain.

With respect to the dates and times relevant cell phone numbers were called via an ATDS or artificial prerecorded voice, the Biggerstaff Report contains no analysis of call data to determine the time of the call at issue. Its RMB analysis relies on a list of phone numbers without dates and times of calls. Its PFS analysis simply states what Mr. Biggerstaff might be able to do with call data. With respect to "where any Defendant's records note said telephone number was a wrong number," the OPH# notation with respect to PFS does not mean "wrong number" at all. Brodman Decl. ¶¶ 12-20. Nor does RMB's "B" notation always mean that a patient or guarantor informed RMB "wrong number." Meyers Decl. ¶¶ 23-25.

The Eleventh Circuit has rejected a flawed methodology requiring a defendant to engage in individualized inquiries to enforce its due process right to challenge class membership. *See Karhu v. Vital Pharm., Inc.,* 621 F. App'x 945, 948-949 (11th Cir. 2015). Relying on *Karhu*, the Court in *Wilson* rejected self-attestation given the amount of TCPA statutory damage of up to $1,500 per call. "This amount is relevant both as an incentive for individuals to improperly enter the class and, as discussed more fully below, a danger that impacts due process protections for Defendant." *Id.* at 458 (citing *Karhu*, 621 F. App'x at 948-49).

Just as in *Wilson*, Plaintiff in our case has challenged the applicability of *Karhu*'s "administratively feasible" requirement to demonstrate ascertainability. Motion at 11,15. The Court in *Wilson* held that although *Karhu* was not published "it is persuasive." *Wilson*, 329 F.R.D. at 457, n.2. It also noted that the TCPA class action before it was "not the sort of case where factors militating against a heightened ascertainability requirement exist." *Id.* citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015) (finding Rule 23 has no ascertainability requirement because, in part, it would have "the effect of barring class actions where class treatment is often most needed: in cases involving relatively low-cost goods or services, where consumers are unlikely to have documentary proof of purchase").

Therefore, Plaintiff's reliance on "self-identifying affidavits" pursuant to *Reyes*, 2018 WL 3145807, at *13 (Motion at 17), *Keim*, 328 F.R.D. at 680, *Northrup v. Innovative Health Ins. Partners*, LLC, 329 F.R.D. 443, 451 (M.D. Fla. 2019) runs afoul of Due Process and the Eleventh Circuit decision in *Karhu*. Plaintiff has not met her burden to demonstrate how it would be administratively feasible to identify class members.   Given the due process concerns presented by Plaintiff's class damages claims, certification should be denied.

### E.      Plaintiff's classes lack numerosity

Class certification is appropriate if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). It is Plaintiff's burden to establish numerosity. *Heaven*, 118 F.3d at 737. Plaintiff must make "some showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d at 1267. As set forth above (See Section IV.B, *supra*), if the placeholder Biggerstaff Report is excluded, Plaintiff cannot meet her burden to show numerosity.

### F.      Plaintiff cannot demonstrate adequacy

Plaintiff asserts that she demonstrates adequacy because she understands her duties as class representative and has no interests antagonistic to the classes. Motion at 21. However, Plaintiff lacks adequacy ████████████████████████████████████████

Plaintiff asserts that her counsel is adequate because she is "represented by counsel with extensive experience litigating TCPA claims and class actions under the TCPA." (Motion at 24)  The record in our case shows Plaintiff's counsel has not been adequate.  In assessing adequacy, courts primarily consider "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia–Pac. Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir.2000). This requirement applies to class counsel and to the named plaintiff who seeks to act as class representative. *Id.* Part of the consideration of adequacy of class counsel is "the work counsel has done in identifying or investigating potential claims in the action" Fed. R. Civ. P. 23(g)(1). In addition, courts "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.*

Plaintiff's counsel lacks adequacy as they were not diligent in obtaining class data from Orlando Health. *See* March 14, 2019 Order at 4-5.  Moreover, Plaintiff's counsel was not diligent in seeking class data from RMB.   Plaintiff's Motion to Compel this information from RMB was denied because of "Morgan's failure to specifically state what she wants the Court to compel RMB to produce to sufficiently respond to Request to Produce 5, the Court cannot discern the remedy Morgan seeks and will not hazard a guess." March 26, 2019 Order (ECF 152 at 5).  Plaintiff's motion to extend the expert cutoff was denied twice.

The lack of diligence compromised the Biggerstaff Report and her Motion to Certify. Plaintiff cannot demonstrate adequacy. *See, e.g., Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 3187410, at *14 (N.D. Cal. June 21, 2013) ("Counsel's failure to diligently pursue discovery and provide…proper evidence in support of class certification does not meet the standard for adequate representation of the class.").

### G.   Plaintiff's classes lack superiority

Plaintiff asserts class treatment is superior to other methods of adjudication because requiring individual class members to file their own suits would deter some from enforcing their rights because the recoverable statutory damages are only $500 (or, up to $1500 if the Court trebles damages).  Motion at 24-25.  Plaintiff's classes lack superiority because of the individualized inquiries that predominate.  "[T]the predominance analysis ... has a tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Klay,* 382 F.3d at 1269.

Determination of the circumstance surrounding consent and for class members would overwhelm this litigation.  Class treatment is therefore not superior to other methods of adjudication.  *See Shamblin*, 2015 WL 1909765, at *13 (holding lack of predominance supported finding lack of superiority).

Given the large number of individualized inquiries presented by Plaintiff's classes, it is difficult to imagine how this case could be tried in a manageable manner consistent with the Defendants' due process rights, which is probably why Plaintiff failed to present any trial plan with their motion.  Assuming Plaintiff's erroneous starting point of 16,659 applicable unique numbers, Plaintiff would apparently seek to rely on inadmissible hearsay "wrong number" and notations at trial to establish potential liability of  $8,329,500 ($500 per call) or $24,988,500 ($1,500 per call).  This result would violate *Tyson Foods, supra.* as well as Due Process.  *See Karhu, supra.*  This "belies any suggestion that a fair administration of the class claims could 'save[] the resources of both the court[] and the parties,'" and precludes certification.  *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1184 (11th Cir. 2010).

### V.   CONCLUSION

Plaintiff has not ascertained a certifiable class, and her theory about how a certifiable class might be ascertained is speculative.  Plaintiff also failed to demonstrate commonality or predominance.  For the foregoing reasons and the reasons set forth in Defendants' Motion to Strike, Plaintiff's Motion to Certify should be denied.

Dated this 7th of June 2019.

*David J. Kaminski*

David J. Kaminski
CA Bar Number:  128509
*pro hac vice*
Carlson & Messer LLP
5901 W. Century Blvd. #1200
Los Angeles, CA 90045
Telephone:  (310) 242-2200
Facsimile:  (310) 242-2222
watkinss@cmtlaw.com
*Attorneys for Defendant, Orlando Health, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of DEFENDANTS'

OPPOSITION TO MOTION FOR CLASS CERTIFICATION was served on counsel of

record by electronic notification pursuant to ECF procedures on this 7th day of June, 2019.


　　/s/　David J. Kaminski
David J. Kaminski