# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

ANGELA MORGAN,                                      CASE NO. 6:17-cv-01972-CEM-GJK

      Plaintiff,

v.

ORLANDO HEALTH, INC.,
G&G ORGANIZATION, LTD. d/b/a
PFS GROUP and RMB, INC.,

      Defendant.                                      /

## DEFENDANTS' OPPOSED MOTION TO STRIKE EXPERT REPORT OF ROBERT BIGGERSTAFF (ECF 173-3) AND PLAINTIFF'S POST-EXPERT REPORT OPINIONS

Pursuant to Fed. R. Civ. P. 26, 37(c)(1), and Fed. R. Evid. 702, Defendants, Orlando Health, Inc. ("Orlando Health"), G&G Organization, Ltd. d/b/a PFS Group ("PFS") and RMB, Inc. ("RMB") (collectively "Defendants") move the Court to strike the following:

(1) The Expert Report of Robert Biggerstaff, submitted in support of Plaintiff's Motion to Certify Class (ECF No. 173-3) (the "Biggerstaff Report"); and

(2) All references to post-Biggerstaff Report data analysis, submitted in support of Plaintiff's Motion to Certify Class.

Plaintiff asserts that she will oppose this motion. In support of this Motion, on behalf of Defendants, Orlando Health states as follows: The Biggerstaff Report and post-Biggerstaff Report data analysis lacks reliability and is not helpful as required by FRE 702 and *Daubert*. Moreover, Plaintiff's post-Biggerstaff Report data analysis is untimely and violates Rule 26.

## I.    BACKGROUND

Plaintiff filed the current lawsuit on November 11, 2017.  She claims Defendants willfully violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") by calling her and putative class members' cellphones using an automatic telephone dialing system ("ATDS") and a prerecorded voice without her prior express consent.  See TAC ¶¶ 39-95.

### A.    After Plaintiff adds RMB and PFS to Third Amended Complaint, on September 27, 2018, Court sets Initial Expert deadline of February 22, 2019.

On August 29, 2018, Morgan filed a Third Amended Complaint against OHI, RMB and PFS.  (ECF 53)  At a scheduling conference hearing on September 27, 2018, the Court entered an Amended Case Management and Scheduling Order ("Amended Scheduling Order").  See ECF No. 78. The Court's Amended Scheduling Order set a deadline of February 22, 2019 for Initial Expert Reports and a deadline of March 22, 2019 for Rebuttal Reports.  The Court denied Plaintiff's request to extend the expert deadlines in this case twice:  first on February 12, 2019 (ECF 128) and again on March 14, 2019 (ECF 148).

### B.    February 22, 2019 – Plaintiff serves Biggerstaff Report

Plaintiff served the Biggerstaff Report on February 22, 2019, as required by the Court's Amended Scheduling Order.  The Biggerstaff Report asserts that RMB calls to wrong numbers can be identified from a spreadsheet of a list of phone numbers provided from Orlando Health to RMB (RMB000230).  This list only contains dates of when phone number flags were changed and counts of calls to when it was designated "*" (with consent). Taylor Report ¶ 31, Ex. G to Opposition to Motion for Class Certification ("Opp. Cert. Motion") [1]; Declaration of James Meyers ¶ 20, Ex. C to Opp. Cert. Motion.

The Biggerstaff Report asserts that substantial numbers of calls (over 120,000) to at least 6,500 unique cell phone numbers relating to RMB were flagged as a wrong number or "never call".  (Biggerstaff Report at pg. 17, ¶ 19)  But he could not determine "from the data

---

[1] For the sake of judicial economy, documents filed in support of Defendants' Opposition to Class Certification are incorporated herein by reference.  Fed. R. Civ. P. 10.

provided so far…the specific dates of those calls, and how many were made to a wrong number or after a DNC notation." *Id.*   Only if "the more complete data were provided, I could determine with specificity which of those calls were made to a wrong number or after DNC notation, and which of the calls fall into the applicable time frame of this litigation." Biggerstaff Report, at pg. 7, ¶ 19.  Mr. Biggerstaff also concedes that he needed additional information to identify "wrong number" PFS calls:

> ***"If Orlando Health, Inc. ("OHI") were to produce the [PFS] Notes data that I understand was uploaded into OHI's Affinity system...*** I would also be able to reliably identify the names and addresses that were associated with those telephone numbers at the time of the calls, using common evidence."

Biggerstaff Report, at pg. 16, ¶ 59.  (emphasis added).

### C.   February 12, 2019 and March 14, 2019 - Court denies Plaintiff's request to extend the expert deadlines

In denying Plaintiff's two requests to continue the expert deadlines in this case, the Court singled out Plaintiff's lack of diligence, stating as follows:  "Morgan's delay from the Rule 30(b)(6) deposition to beginning negotiations with Orlando Health to retrieve the documents and in filing the motion to compel demonstrate that Morgan did not exercise due diligence." March 14, 2019 Order at 4-5.

### D.   March 8, 2019 – Court grants Motion to Compel against OHI

On March 8, 2019, the Court granted Plaintiff's Motion to Compel against OHI for the production of patient data.  On March 15, 2019, OHI produced electronic patient data, which it designated as OHI000241.  Declaration of Stephen A. Watkins, ¶ 5, Ex. D to Opp. Cert. Motion.

### E.   March 22, 2019 – Defendants timely serve their expert reports

On March 22, 2019, Defendants timely served the expert reports of Ken Sponsler and John Taylor, as required by the Amended Scheduling Order.  Watkins Decl., ¶ 9.

**F.      March 27, 2019 – OHI produces all of its account data**

On March 27, 2019, Orlando produced all of its account data, OHI000243-252, which was more extensive than OHI000241.  Watkins Decl., ¶ 10.

**G.      April 22, 2019 – Plaintiff's Expert Robert Biggerstaff testifies**
**        that he will not perform the analysis he contemplates for "a**
**        few months"**

On April 22, 2019, Defendants took the deposition of Robert Biggerstaff.  In the Biggerstaff Report, Biggerstaff contemplated a class identification process of (A) locating wrong number notations in RMB and Orlando health data; (B) performing an "iterative process" which includes technology-assisted key word searches and weeding out "false positives"; (C) submitting the numbers identified in (A) and (B) via subpoena to the various wireless carriers; and (D) performing yet another "iterative" process. *See* April 22, 2019 Deposition Transcript of Robert Biggerstaff ("Biggerstaff Depo.) at 30:20-25, 31:1-25, 33:4-25, 34:1-25, 35:1, 51:22-25, 52:1-25, 53:-1-5, 58:10-25, 59:1-29, 95:3-25; 96:1-14, Ex. E to Opp. Cert. Motion.

At deposition, Mr. Biggerstaff conceded this analysis was prospective with respect to both RMB and PFS:

> "Q.  Yeah. One last question, and then we'll take a break.  We've got to go through a process as you described of where the attorneys need to set the criteria or parameters, at which point then you will come up with a list of phone numbers based off that criteria. Those will be submitted to the carriers in the form of subpoenas, you'll get information back from them, and then at some point, you will be able to extrapolate from that a list of putative class members. Is that right?
> A.  Whatever criteria you want, yes, for example, do you want to match by name or not, you know.
> Q.  And how long is that process going to take you?
> A.  Matching by name?
> Q.  **No, this whole process I just described. When would you expect to be able to produce a list of putative class members**?
> A.  You're asking for a date?
> Q.  Approximate date.
> A.  I would have to look at my book. I'd have to see what's on my schedule, what time I can schedule an analysis. It's summertime, we're having

vacations coming, and things like that, so -- and you're going to include the
time to get subpoenas back from the phone companies, and that's probably
going to be rolling production. A few months.
Q.  And how much time have you dedicated to spend on this case over the
next 30 days?
A.  **The next 30 days?**
**Q.  Yes.**
**A.    Very little.  I have other things scheduled, both personal and
professional."**

Biggerstaff Depo. at 95:3-25; 96:1-14 (emphasis added).  *See also* Biggerstaff

Depo. at 31:17-25; 32:21-25, 33:1-2, 37:1-10.

   With respect to his proposed analysis of PFS data contemplated in paragraph 59 of

the report, Mr. Biggerstaff testified that he counted 16,051 instances of Oph# in OHI000241.

Biggerstaff Depo. at 9:4-25, 10:1-25, 11-10, 104:24-25; 105:1-7   and Ex. 2 thereto.

Plaintiff's Motion wrongly asserts that "PFS's code is "Oph#", meaning agent selected

wrong number code, resulting in Oph# code adjacent to applicable phone number." Motion

at 4.   However, Oph# simply indicates a change in or removal of a phone number, for any

number of multiple reasons and not necessarily because the prior phone number was wrong.

*See* Declaration of Jason Brodman ("Brodman Decl.'), ¶¶ 12-20, Ex. B to Opp. Cert.

Motion.

   **H.    May 14, 2019 – Plaintiff serves notice of subpoenas to wireless carriers**

   On May 14, 2019, Plaintiff served a Notice of Subpoenas to the major wireless

carriers of 16,659 phone numbers. Watkins Decl. ¶ 12.   Plaintiff does not explain the

discrepancy between the 16,659 subpoenaed numbers and the 17,218 unique phone numbers

asserted in her Motion.  *Id.*

   **I.    May 24, 2019 – Plaintiff files Motion to Certify along with post-
         Biggerstaff Report call analysis**

   On May 24, 2019, Plaintiff filed her Motion to Certify Class.  Plaintiff asserts that

her class is composed of persons called at 17,218 unique cell phone numbers. These 17, 218

phone numbers are alleged to be comprised of:

   1.  The  6,500 phone numbers relating to RMB identified in the Biggerstaff Report

   2.  9,718 numbers relating to PFS.

{00116964;1}                                     5

Although Biggerstaff, at his deposition, asserted 16,051 instances of Oph# relating to PFS, regardless of the reason for the removal or change of number, Plaintiff's Motion states, "After scrubbing those numbers to remove landlines and duplicates as described in his report and testimony, Plaintiff's expert identified 9,718 unique cellular numbers to which PFS made a wrong number-dispositioned call." (Motion at 5). Again, Plaintiff's assertion that the code Oph# equates to a wrong number is unsupportable. Plaintiff has not cited any deposition transcript for this specific identification of 9,718 unique cellar phone numbers, nor any affidavit of Biggerstaff in support. She only relies on the Biggerstaff Report for the general proposition of how this *might* be done. (Motion at 5, fn. 3).

Plaintiff's Motion also states: "At least 179 of the wrong numbers RMB called had a wrong number notation in OHI's records before OHI ever sent the accounts and numbers to RMB for collection." (Motion at 5-6). Plaintiff has not cited any deposition transcript for this specific identification of 179 "wrong numbers," nor any affidavit of Biggerstaff in support.

Finally, Plaintiff's Motion never states she can identify the date and time of calls made by RMB and PFS on behalf of Orlando Health. Mr. Biggerstaff at best states "I believe, though, the individual dates of the calls are in the data, so we can send that." (Biggerstaff Depo. at 70:13-16).

## II.    ARGUMENT

### A.    Biggerstaff's Opinions Should Be Excluded

The Biggerstaff Report is a placeholder report. *See, e.g., Tessina Holdings Pty. Ltd. v. Trend S.P.A.*, No. 16-62899-CIV, 2018 WL 6807294, at *1 (S.D. Fla. Oct. 1, 2018) (striking supplemental expert report and holding "the expert's initial report was not, for all practical purposes, much of a report at all. Instead, it was basically a mere placeholder, designed to give [the offering party] a report (of some kind) to supplement later with the actual substantive opinions.") As such, Plaintiff cannot meet her burden to show that the Biggerstaff Report survives *Daubert* analysis. Moreover, Plaintiff cannot circumvent Rule 26 with her post-Biggerstaff Report analysis. *See* Section II.C. *infra*.

District courts in the Eleventh Circuit must perform a "full *Daubert*" analysis "when an expert's testimony is critical to the class certification." *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin'l Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014) (quoting with approval *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010)); *Sher v. Raytheon*, 419 Fed.Appx. 887, 890–91 (11th Cir. 2011) (unpublished).

Under this "full" *Daubert* analysis, if the expert information is necessary to establish a Rule 23 requirement, the district court, as the trier of fact for class certification, "must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Sher*, 419 Fed. Appx. at 890–91 (quoting *Am. Honda*, 600 F.3d at 815–16). The Eleventh Circuit determined in *Sher* that a district court errs as a matter of law "by not sufficiently evaluating and weighing conflicting expert testimony" because the plaintiff must prove more than a *prima facie* case under Rule 23 for class certification. *Id.* Therefore, where an expert opinion necessary to class certification is challenged, such as in this case, the Court must perform a full *Daubert* analysis.

Here, Mr. Biggerstaff's testimony is critical to class certification because Plaintiff relies on his opinions to demonstrate a class-wide method of identifying class members and showing that individualized inquiries do not predominate. Plaintiff's theory is that, at some time in the future, he will use a three-step process: First, locate phone numbers associated with notations of Oph# in Orlando Health's records and with notations of B or ! in RMB's records. Second, perform an "iterative process," which includes excluding false positives and automated key word searches. Third, subpoena the various wireless carriers for subscriber and user information for the remaining phone numbers and again performing an "iterative process." See Biggerstaff Depo. at 30:20-25, 31:1-25, 33:4-25, 34:1-25, 35:1, 51:22-25, 52:1-25, 53:-1-5, 58:10-25, 59:1-29, 95:3-25; 96:1-14; Biggerstaff Report ¶¶ 29-30

Without Mr. Biggerstaff's testimony on those issues, Plaintiff has no way to meet her burden of proving predominance, ascertainability and numerosity under Rule 23.

The Eleventh Circuit has established a three-part conjunctive test to determine whether expert testimony should be admitted under *Daubert*:

> "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).  The party seeking to introduce expert testimony bears the burden of satisfying these criteria by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). As shown below, Plaintiff cannot demonstrate Biggerstaff's report is based on reliable methodology and that it assists the trier of fact (i.e. "helpful").

Under these Eleventh Circuit criteria, the Biggerstaff Report must be excluded.

### 1.    The Biggerstaff Report is not reliable because it is wholly prospective

With respect to reliability, the traditional factors a court may consider are "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular [expert] technique; and (4) whether the technique is generally accepted in the [expert] community." *United States v. Frazier,* 387 F.3d 1244, 1262 (11th Cir. 2004).

The trial court's gatekeeping function requires more than simply "taking the expert's word for it." *Frazier*, 387 F.3d at 1261 (quoting Fed.R.Evid. 702 advisory committee's note (2000 amends.)). Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786).

"[E]xperts commonly extrapolate from existing data," but where the opinion evidence is connected to existing data by nothing more than "the ipse dixit of the expert," the district court is free to "conclude that there is simply too great an analytical gap between the data and the opinion proffered" for reliability. *General Elec. Co. v. Joiner*,

522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).  Also, *Daubert* cautions that the "knowledge" requirement which qualifies an expert under Rule 702 "connotes more than subjective belief or unsupported speculation." 509 U.S. at 590, 113 S.Ct. 2786.

However, speculation is all Plaintiff has.  In *Burke v. General Motors Corp*., the Eleventh Circuit excluded the expert's testimony because his proposed methodology had not been tested and therefore not reliable.  218 Fed. Appx. 951, 953 (11th Cir. 2007); *see also Hall v. United Insurance Company of America, Inc.,* 367 F.3d 1255, 1258 (11th Cir. 2004) (excluding expert testimony because the expert did not review sufficient facts or data upon which to base his opinion and did not cite to any scientific methodology or literature supporting his conclusions or approving of the method he employed to make those conclusions); *Martinez v. Altec Indus., Inc*., No. 3:02CV1100J32TEM, 2005 WL 1862677, at *9 (M.D. Fla. Aug. 3, 2005) (excluding expert testimony where not sufficiently tested and holding "the Court's gatekeeping function requires more than simply taking the expert's word for it.")

The Biggerstaff Report only speaks to what Biggerstaff ***might*** do if he had sufficient data.  With respect to the RMB data, he states "If the more complete data were provided, I could determine with specificity which of those calls were made to a wrong number."  Biggerstaff Report, at pg. 7, ¶ 19.

With respect to the PFS data, he states "If Orlando Health, Inc. ("OHI") were to produce the [PFS] Notes data that I understand was uploaded into OHI's Affinity system, I can perform the foregoing analyses on the [PFS] data…"  Biggerstaff Report, at pg. 16, ¶ 59.  Biggerstaff's deposition makes it clear that he performed his limited analysis of OHI000241 relating to PFS calls months after his February 22, 2019 report—confirming how prospective the Biggerstaff Report was in nature.

At deposition, Biggerstaff conceded he had not performed the "iterative process" (including false positive analysis) and review of carrier responses to subpoenas—steps two and three of his proposed analysis.  Biggerstaff Depo. at 95:3-25; 96:1-14.

This type of speculative expert call analysis has specifically been rejected multiple times in the context of TCPA class actions. In *Jacobs v. Quicken Loans, Inc.*, the court refused to credit an expert's opinion that "one could query Defendant's databases to determine the existence of prior communications" indicating consent, because such "arguments regarding the potential class are based on speculation . . . , as opposed to being grounded in evidence." 2017 WL 4838567, at *3 & n.5 (S.D. Fla. Oct. 19, 2017). And in *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, the court struck the expert's opinions because he "merely describe[d] the analysis that 'could be performed'" to analyze calling data, but had not actually conducted the analysis. No. 15-CV-6314-YGR, 2017 WL 1806583, at *5 (N.D. Cal. May 5, 2017). *See also Southwell v. Mortg. Inv'rs Corp. of Ohio*, No. C13-1289 MJP, 2014 WL 3956699, at *4 (W.D. Wash. Aug. 12, 2014) (striking TCPA expert declaration on the grounds it was "***entirely prospective; i.e., it simply describes what she intended to do with the data provided by Plaintiffs***. ")(emphasis added).

Without such expert testimony, Plaintiff cannot establish predominance or ascertainability. *See, e.g., Cotromano v. United Techs. Corp.*, No. 10-80840-CIV, 2018 WL 2047468, at *19 (S.D. Fla. May 2, 2018) (holding "[d]ue to the scientific unreliability" of plaintiff's expert's analysis, "Plaintiffs are unable to satisfy the predominance element of Rule 23(b), compelling defeat of their current motion for class certification.")

The placeholder Biggerstaff Report is wholly speculative and as of the date of Plaintiff's Motion, Biggerstaff has not conducted the analysis described in his report. This unreliable analysis should be stricken.

### 2. The Biggerstaff Report is not reliable because it does not work

The Biggerstaff Report is not reliable because its starting points are flawed. Only persons who were called on their cell phones without consent at the time of the call could potentially recover in this lawsuit. The F.C.C. estimates that every day 10,000 cellular telephone numbers are reassigned to new users. Sponsler Report, ¶ 80 (citing 30 F.C.C. Rcd. 7961, 8090 (2015). *See also Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473 (S.D. Cal. 2014) (acknowledging reassignment of cell phone numbers rendered TCPA class

unmanageable).  Plaintiff's Motion never states how she can identify the date and time of calls made by RMB and PFS on behalf of Orlando Health over the four-year class period, only a "belief."  (Biggerstaff Depo. at 70:13-16.)  Without that information as a starting point, Plaintiff's methodology has nowhere to go.

### a.   The Biggerstaff Report methodology with respect to RMB fails

Plaintiff's methodology with respect to RMB is not linked to any call data at all. RMB's procedures specify that its phone flags be changed from * (consent to call) to B (bad number) or ! (never call) in certain instances.  Declaration of Patrick James Meyers at ¶¶ 15-16 & Ex. 2 thereto, attached as Exhibit C to Opp. Cert. Motion.  RMB000230 also identifies columns denoting various changes in phone flag status.  Meyers Decl., ¶¶ 19-20. It does not include any call information relating to these numbers, such as date and time of call.  *Id.*

For nine phone number types, the Biggerstaff Report allegedly counts the number of phone flag changes from * to B ("bad number"), and from * to ! ("never call").  He then cross references the number of counts of "predictive dialer" and "robo calls" for these numbers, but only counts the calls made while the number was coded with an * (cellphone with consent to call).  Taylor Report, ¶¶ 12, 31, Ex. G to Opp. Class. Cert.

Plaintiff asserts this is a valid starting point to ascertain her wrong number RMB class.  Mr. Biggerstaff apparently has other ideas: "What does Page 20 of your report tell us about the number of calls to phone numbers that  were labeled "WN" or "DNC"?  A.  It doesn't."  Biggerstaff Depo. at 27:10-14.

Plaintiff did not have call data in RMB records and therefore could not ascertain if calls were made after the change flag to "Never Call."  Meyers Decl. ¶ 27.  Moreover, the "Never Call" flag may be the result of an inbound call by a debtor.  *Id.* ¶ 28.  Determining the circumstances of the flag would require individual review of the notes.  *Id.*  ¶ 29.

Entry of the B code does not always mean an outbound call by RMB whereby a live person informs RMB "wrong number."  *Id.* ¶ 24 & Ex. 2.  A "B" phone flag may include a disconnected number, among other things.  *Id.*

Biggerstaff does not assert that the columns in RMB000230 showing change in phone flag from * a "B"(what Biggerstaff labels "WN") means "wrong number". He states it only reflects a change in phone flag. "***I'm not saying it's a wrong number***; I'm saying that is a record that has a phone number in Column DU68001 and has a date in Column DU81004." Biggerstaff Depo. at 27:22-23 (emphasis added).

Moreover, Defendants assert that "wrong numbers" are often the result of borrowers' ducking collection calls—responding to a call by saying "wrong number" in order to postpone a difficult conversation to another day. See Sponsler Report ¶¶ 68-69, attached as Ex. F to Opp. Cert. Motion; Meyers Decl. ¶ 24. *See also Tillman v. Ally Fin. Inc.,* No. 2:16-CV-313-FTM-99CM, 2017 WL 7194275, at *7-8 (M.D. Fla. Sept. 29, 2017), *7–8 (holding "defendant has offered evidence that in the debt collection industry "wrong number" oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though the correct number was called, as a way to avoid further debt collection.")

At deposition, Mr. Biggerstaff conceded that there needed to be an "iterative" process to sort out "false positives," stating "One of the things you do in the refinement process in the iterative process is you add stop words and you refine your search terms so that you eliminate false positives." Biggerstaff Report at 34:22-24. Plaintiff's expert agrees that the Court cannot simply rely upon the "wrong number" notations. So does Defendants' expert Ken Sponsler. Sponsler Report, ¶¶ 68-76. Yet, Mr. Biggerstaff has not performed any iterative analysis to avoid false positives or shown how his results would be accurate. Expert John Taylor located two false positives out of a sample of five accounts, one relating to RMB and one relating to PFS. Taylor Report, ¶¶ 22-23; Taylor Decl. ¶ 38.

The Biggerstaff Report asserts that Biggerstaff would use "common evidence" to identify users and subscribers of the phone numbers. At deposition, Mr. Biggerstaff identified use of third-party subpoenas to the wireless carriers as this "common evidence." Biggerstaff Depo. at 46:8-25, 47:1-7. This methodology is unreliable. "[I]In light of the record retention policies of some of the major cellular service providers, it is likely that

even subpoenaing the cellular service providers will not yield the necessary identification and contact information." *Smith*, 297 F.R.D. at 473 .

Ten days before filing her class certification Motion, Plaintiff served the major carriers with subpoenas for 16,659 phone numbers. Watkins Decl., ¶ 12. Any responses to these subpoenas will be insufficient to properly identify class member or avoid predominance of individualized inquiries relating to consent. Mr. Biggerstaff himself is not sure of this process. He states, "Like I said, it's an iterative process. I get the subpoena results back, and we start matching on names, and then we see if we have a lot of hits and we're good or we have a lot of misses and we need to go on to something else." Biggerstaff Depo. at 74:18-23.

Mr. Biggerstaff's vacillation is justified as either the current subscriber or non-subscriber customary user of the phone can give consent under the TCPA. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7999 (2015). It is not possible to reliably identify the subscriber of a mobile phone number at a historical point in time. Sponsler Report ¶¶ 38, 55-60, 80-86. Generally, the only information a carrier generally possesses is the subscriber as of today.

With respect the customary user of a phone, Sprint, AT&T, Verizon & U.S. Cellular all report that the user information it receives on post-paid accounts is generally at the discretion of the subscriber. See Affidavit of Calli Keep (Sprint) at ¶ 8; Declaration of Lisa Likely (AT&T) at ¶ 6; Declaration of Neil Schmidt (Verizon) at ¶ 4, Declaration of George Kamba (U.S. Cellular) at ¶ 6; Declaration of Patricia Cauldwell (T-Mobile) at ¶ 3[2]; Sponsler Report, ¶¶ 50-53. Not the customary user as of today, and certainly not the subscriber and customary user over a four-year period.

A majority of U.S. households now use only a cell phone. Carriers generally do not possess subscriber information for many pre-paid phone plans such as the Metro by T-Mobile, Cricket and Boost Plans. Keep Decl., ¶ 9 at OHI000254, Likely Decl. ¶ 3 at OHI000256, Sponsler Report, ¶¶ 46-48.

---

[2] Attached as Exhibits 1 through 5 to the Declaration of Stephen A. Watkins.

Often carriers cannot identify subscribers or customary users of post-paid cellular plans. Taylor Report, ¶ 36. This is due to the use of family and other "group" calling plans—i.e., plans with multiple telephone lines under a single "master" subscriber/account. See Likely Decl., ¶ 7 at OHI000257; Schmidt Decl. at ¶ 5, at OHI00260; Sponsler Report, ¶¶ 51-53, 88-93. What is relevant in a TCPA class action is identifying the subscriber or customary user of a phone number at the time of the phone call during the four-year class period. Even if Biggerstaff received responses to the subpoenas, he would not be able to properly identify all of the authorized subscribers and regular users of the subpoenaed phone numbers at the date and time of the call over the four-year period who could have consented.

The proposal in Plaintiff's favorite case, *Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668, 679 (S.D. Fla. 2018) included "the use of both carrier subpoenas and reverse-lookups for any membership information not captured by the subpoenas." However, Mr. Biggerstaff rejected any intention of using reverse lookup. Biggerstaff Depo. at 45:13-23. Moreover, the Court in *Keim* did not have before it carrier affidavits on these issues.

**b.   The Biggerstaff Report methodology with respect to PFS fails**

With respect to PFS, the only timely methodology Biggerstaff provided was that if he received data, he would perform an analysis similar to his RMB analysis. Biggerstaff Report, at pg. 16, ¶ 59. Therefore Defendants assert Biggerstaff's methodology with respect to PFS is similarly unreliable.

**3.      The Biggerstaff Report is Not Helpful**

In terms of helpfulness, "the court must ensure that the proposed expert testimony is relevant to the task at hand, ... i.e., that it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). That is, "there is no fit where a large analytical leap must be made between the facts and the opinion." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1306 (11th Cir. 2014) (internal quotations omitted). Therefore, the speculation that undercuts any showing of reliability in the Biggerstaff report also shows that there is no fit.

To meet that burden here, Plaintiff must show that Biggerstaff has demonstrated that the elements of a TCPA violation (including a lack of consent) are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012). Without such expert testimony, Plaintiff's classes fail. *See Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 376 (N.D. Fla. 2017) (holding "In light of the Court's Daubert rulings excluding the opinions of Dr. Sawyer, Dr. Flowers, and Dr. Wade…Plaintiffs are unable to meet their burden for class certification."); *Cotromano, supra.*

Plaintiff's identifies a flawed methodology for identifying the telephone numbers of individuals who are members of the proposed classes, as plaintiff has defined those classes. As shown above, this methodology does not resolve the question of whether Orlando Health had prior express consent to call the thousands of individuals in these classes at the time each call was placed. That alone requires his opinions to be excluded.

Accordingly, Mr. Biggerstaff's opinion is useless for the purpose plaintiff seeks to introduce it—to show that liability can be established through common proof and thus common issues predominate. *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (predominance was defeated where plaintiff "failed to advance a viable theory"). Nor can Biggerstaff show her classes are administratively feasible to ascertain. It should be stricken.

## C.    Biggerstaff's Post-Report Analysis of OHI Data Relating to PFS should be stricken

Plaintiff's reference to post-Biggerstaff Report analysis of Orlando Health data relating to PFS should be stricken as it is a *de facto* untimely expert report. Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or the witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Rule 37 acts as an automatic sanction barring the party from using that information or witness, unless the failure was substantially

justified or harmless." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 11251736, at *2 (S.D. Fla. July 29, 2015).

Rule 26(a) is clear that an expert's report must contain "a complete statement of all opinions the witness will express," "the data or other information considered by the witness in forming them," and "any exhibits that will be used to summarize or support them." Fed.R.Civ.P. 26(a)(2)(B).   Plaintiff's post-Biggerstaff Report opinions should be excluded. *See Cochran v. Brinkmann Corp.*, No. 1:08-CV-1790-WSD, 2009 WL 4823858, at *6–7 (N.D. Ga. Dec. 9, 2009) (excluding opinions based on late testing that was not substantially justified nor were the late testing or harmless); *Tessina*, 2018 WL 6807294, at *7 (same).

Mr. Biggerstaff is not new to attempts to backdoor his opinions.  *See Giesmann v. American HomePatient, Inc.*, 2017 WL 2709734 at *3 (E.D. Mo. June 22, 2017).  In that case, the court struck Mr. Biggerstaff's declaration, submitted in support of plaintiff's motion for class certification, because plaintiff failed to disclose Biggerstaff until four months after the deadline for expert disclosure. *Id.*

That Plaintiff's supplemental data analysis is not set forth in a report but buried as conclusory pleading is a distinction without a difference. *See, e.g., Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016) (holding "I find that Haaland's April 2016 declaration is, for all intents and purposes, a supplemental expert report containing new information not disclosed in his previous two reports").

Plaintiff cannot demonstrate that the post-Biggerstaff Report opinions are "substantially justified."  This Court has already held that Plaintiff's failure to obtain data from Orlando Health prior to the expert cutoff was Plaintiff's own fault: "Morgan's delay from the Rule 30(b)(6) deposition to beginning negotiations with Orlando Health to retrieve the documents and in filing the motion to compel demonstrate that Morgan did not exercise due diligence." March 14, 2019 Order at 4-5.

This type of lack of diligence in obtaining discovery is grounds to exclude an untimely expert report. *Tessina*, 2018 WL 6807294, at *7.  In that case, the plaintiff

moved to strike the untimely supplemental expert report of the defendant's accountant. *Id.* at *2. The Court held that the defendant sought to supplement because it "is obvious that the preliminary report was simply a placeholder, meant to technically meet the disclosure deadline in a last-minute rush." *Id.* at *6. The court in *Tessina* rejected the defendants' argument that it did not submit a timely supplemental expert report in part because it needed additional documents from the plaintiff. "Defendants' argument fails to persuade. What happened here is crystal clear: Defendants were simply not diligent." *Id.* at *7.

In excluding the supplemental report pursuant to Fed. R. Civ. P. 37(c)(1), the Court in *Tessina* also held that the late disclosure was not harmless. The defendant offered a late deposition of the expert, but "that would have been beyond the discovery cutoff." Moreover, crediting Defendants' cure option by denying the motion to strike would run "contrary to Rule 26 and the Court's scheduling Orders." *Id. See also Giesmann*, 2017 WL 2709734, at *4 (holding "Although no trial date has been set, the Court finds that admission of Biggerstaff's Declaration after the deadline for expert witnesses expired would disrupt and delay a possible trial.")

The Orlando Health data that Plaintiff's PFS analysis relies upon (OHI000241) was produced after Plaintiff's expert report. Just as in *Tessina*, this Court has already determined that Plaintiff's failure to obtain this data beforehand was the result of her own lack of diligence. Given that the discovery cut-off was June 6, 2019, and Plaintiff has already filed her Motion to Certify, Plaintiff's late disclosure of her Post-Biggerstaff Report opinions relating to PFS is not "substantially justified" or harmless. It should therefore be stricken pursuant to Rule 37(c)(1). Moreover, *Tillman* demonstrates that individualized issues predominate, regardless of the data provided: "[E]ven if plaintiff received the requested information…it would still not ameliorate the fact that …a search of Ally's records would not reveal whether the call recipients who claimed "wrong number" in fact had revoked their consent to call." *Tillman*, 2017 WL 7194275, at *8.

Similarly, with respect to RMB, Plaintiff's Motion also states: "At least 179 of the wrong numbers RMB called had a wrong number notation in OHI's records before OHI

ever sent the accounts and numbers to RMB for collection." (Motion at 5-6). This assertion also had to be based on post-Biggerstaff Report Orlando Health data that was not previously obtained due to Plaintiff's lack of diligence. This Post-Biggerstaff Report opinion relating to RMB should be similarly stricken.

**D.      Plaintiff's Post-Biggerstaff Report Opinions should be stricken because they do not satisfy _Daubert_**

Even if this Court does not strike the Post-Biggerstaff Report opinions for being untimely, they should be excluded for the same reasons as the Biggerstaff Report opinions—they lack reliability and are not helpful.

**1.      Plaintiff's post-Biggerstaff Report opinions regarding PFS are unreliable and do not assist the trier of fact**

The starting point for Mr. Biggerstaff's unreliable post-Biggerstaff Report opinion as to PFS is his testimony that he counted 16,051 instances of OPH# in OHI000241. Biggerstaff Depo. at 9:4-25, 10:1-25, 11-10, 104:24-25; 105:1-7 & Ex. 2 thereto. Plaintiff, not Mr. Biggerstaff, asserts OPH means "wrong number." See Biggerstaff Depo. at 85:11-12 ("I have no idea what OPH stands for.")  OPH# indicates a change in phone number, for any reason, and not that the prior phone number was wrong. Brodman Decl. ¶¶ 12-20.

Indeed, there are many reasons why PFS would note a change of phone number in its records. PFS has reviewed the Orlando Health account notes produced in discovery in this case on approximately 1100 accounts containing the OPH# code ("review sampling"). _Id._ at ¶ 19. This research and review of the OHI account notes – which incorporate some of the PFS data – revealed several commonly-used reasons for the OPH# code _that were not associated with a wrong number_. A sample of some of those reasons is below:

| Reason | Instances |
| --- | --- |
| VIP – patient has a relationship with OHI | 369 |
| Inbound Call | 357 |
| Guarantor/Patient has Moved | 150 |
| Replaced # with Land Line | 93 |
| Spouse is Guarantor or handling account | 57 |
| Deceased | 44 |
| Son/Daughter is Guarantor or handling account | 25 |

{00116964;1}

18

| | |
|---|---:|
| Attorney | 22 |
| Minor as Patient | 7 |
| Incarcerated | 5 |
| International | 4 |
| Contact Only by Mail | 3 |
| Total | 1136 |

*Id.*

This review sampling demonstrates, for instance, that at least 369 patient accounts Plaintiff identified as associated with "wrong number" calls, because of the presence of the OPH# code, were actually accounts where PFS removed a phone number because the patient was considered a VIP of Orlando Health (such as a board member, an employee, or a family member of an Orlando Health employee). *Id.* at ¶ 20.

Similarly, Taylor's review of relevant demonstrate the unreliability of Biggerstaff's post-Biggerstaff Report analysis. Just as in T*omeo v. CitiGroup, Inc.,* No. 13 C 4046, 2018 WL 4627386, at *9 (N.D. Ill. Sept. 27, 2018), "Taylor supports his opinion with specific evidence." Taylor's analysis found zero wrong number calls associated in one random pull of 100 Orlando Health records that included 29 OPH# notations. Taylor Decl. ¶ 34, attached as Ex. H to Opp. Cert. Motion. In his second pull of all OPH# accounts, Taylor found 71 OPH# notations that were not associated with "WN" or "Wrong Number." Taylor Decl. ¶ 35. The remaining 29 would require an individualized inquiry as to the reliability and circumstances of the wrong number notation. *Id.* at ¶ 35-37; Brodman Decl. ¶ 14. Regardless, these findings are well above the 20% error rate that decertified the class in *Johnson*, and the 15% error rate that precluded certification in *Tomeo,* 2018 WL 4627386, at *9.

Biggerstaff incorrectly assumed that each appearance of the OPH# code in the Orlando Health patient account notes indicated that PFS dialed a wrong number (because PFS is the only Defendant that uses the OPH# code.) But his conclusion is based on a totally incorrect factual premise which makes his findings misleading, false, and unreliable.

2.    **Plaintiff's post-Biggerstaff Report opinions regarding RMB are unreliable and do not assist the trier of fact**

Plaintiff's Motion states: "At least 179 of the wrong numbers RMB called had a wrong number notation in OHI's records before OHI ever sent the accounts and numbers to RMB for collection." (Motion at 5-6). Plaintiff has not cited any support for this specific identification of 179 "wrong numbers". Taylor's review shows that Biggerstaff's reliance on RMB000230 (which does not contain dates and times of calls) is an absurd starting point for analysis that Plaintiff contends ends in the assertion that there were 179 accounts Orlando Health assigned to RMB with a wrong number notation. Taylor Decl. ¶ 24. Plaintiff does not explain how the 179 number was determined. As Taylor attempted to back into the basis for the 179 number, this only resulted in confirming Biggerstaff counted data rows rather than calls to obtain Biggerstaff's initial "120,000 calls" number. Taylor Decl. ¶¶ 18-22. Given that Orlando Health was not been able to match Plaintiff's naked assertion of the 179 wrong numbers, given Biggerstaff's starting point, this bare post-Biggerstaff Report opinion lacks any indicia of reliability.

Moreover, with both the RMB and PFS phone numbers, Plaintiff has not yet attempted to perform the speculative "iterative" process he described at his deposition to weed out wrong numbers. Nor has he received phone carrier responses sufficient to identify class members and to show that individualized issues not predominate. This speculation is the very "taking the expert's word for it," rejected by the Eleventh Circuit in *Frazier*. 387 F.3d at 1261. The post-Biggerstaff Report opinions should be stricken.

**III.    CONCLUSION**

The Biggerstaff Report is wholly prospective and therefore does not satisfy *Daubert*. Moreover, the proposed methodology is not reliable and will not assist the trier of fact. It should be stricken in its entirety. The Post-Biggerstaff Report opinions suffer from the same defects and should be stricken. Moreover, all reference to post-Biggerstaff Report data analysis submitted in support of Plaintiff's Motion to Certify Class should be stricken as untimely supplemental expert opinion.

Dated this 7th day of June, 2019.

         /s/   David J. Kaminski
David J. Kaminski
CA Bar Number: 128509
*pro hac vice*
Carlson & Messer LLP
5901 W. Century Blvd. #1200
Los Angeles, CA 90045
Telephone:  (310) 242-2200
Facsimile:  (310) 242-2222
watkinss@cmtlaw.com
*Attorneys for Defendant, Orlando Health, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of DEFENDANTS'
OPPOSED MOTION TO STRIKE EXPERT REPORT OF ROBERT BIGGERSTAFF
(ECF 173-3) AND PLAINTIFF'S POST-EXPERT REPORT OPINIONS was served on
counsel of record by electronic notification pursuant to ECF procedures on this 7th day of
June, 2019.


    /s/   David J. Kaminski
David J. Kaminski